FILED

2022 Jan-05 PM 01:42
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| **GERALD PAULK, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF AMANDA NICOLE FOSTER, DECEASED; YANCY TYLER ROPER, AS ADMINISTRATOR OF THE ESTATE OF YANCY FARRELL ROPER, DECEASED; JOHN SANDERSON; ALVIN BROWN; ELFORD BURNS; HARREL BURNS; BRYAN MCGAHA; TIM PARKER; WAYNE WALDROP,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | **Case No.:** |
| **Plaintiffs,** )<br>)<br>) | |
| **v.** )<br>) | |
| **TENNESSEE VALLEY AUTHORITY,** )<br>)<br>) | |
| **Defendant.** ) | |

---

## COMPLAINT

---

Gerald Paulk, as Personal Representative of the Estate of Amanda Nicole Foster, deceased; Yancy Tyler Roper, as Administrator of the Estate of Yancy Farrell Roper, deceased; John Sanderson; Alvin Brown; Elford Burns; Harrel Burns; Bryan McGaha; Tim Parker; and Wayne Waldrop, Plaintiffs in the above-styled cause, complain of Defendant Tennessee Valley Authority as follows:

## PARTIES

1.      Plaintiff Gerald R. Paulk, as Personal Representative of the Estate of Amanda Nicole Foster, deceased, is an adult resident citizen of Jackson County, Alabama.

2.      Plaintiff Yancy Farrell Roper, as Administrator of the Estate of Yancy Tyler Roper, deceased, is an adult resident citizen of Shelby County, Alabama.

3.      Plaintiff John Sanderson is an adult resident citizen of Claremont, New Hampshire.

4.      Plaintiff Alvin Brown is an adult resident citizen of Jackson County, Alabama.

5.      Plaintiff Elford Burns is an adult resident citizen of DeKalb County, Alabama.

6.      Plaintiff Harrel Burns is an adult resident citizen of DeKalb County, Alabama.

7.      Plaintiff Bryan McGaha is an adult resident citizen of Jackson County, Alabama.

8.      Plaintiff Tim Parker is an adult resident citizen of Lincoln County, Tennessee.

9.      Plaintiff Wayne Waldrop is an adult resident citizen of Jackson County, Alabama.

10.     Defendant Tennessee Valley Authority (TVA) was created by the Tennessee Valley Authority Act of 1933, Pub. L. No. 73-17, 48 Stat. 58 (1933) (Preamble); 16 U.S.C. § 831. Congress "intend[ed] that [TVA] shall have much of the essential freedom and elasticity of a private business corporation." H.R. Rep. No. 130, 73d Cong., 1st Sess., at 19 (1933). TVA has used this flexibility and independence to become a substantial commercial enterprise. TVA is the largest public power company in the United States and operates one of the largest electric power systems in North America, supplying electric power to more than 8.6 million customers in parts of seven states. In 2005, TVA spent approximately $6.5 billion to operate its power system, which generated approximately $7.8 billion in annual revenues. These revenues are kept by the TVA to support its further corporate enterprises, and it is only required to pay a portion of its revenues to the United States Treasury. Thus, TVA is an independent corporation with nearly complete autonomy from direction and oversight of the U.S. government, and any judgment against it is not paid out of U.S. Treasury funds. For that reason, Congress has specifically excepted TVA from the auspices of a suit against the United States, and the TVA may be sued in its corporate name. See 16 U.S.C. § 831c(b).

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action pursuant to 28

U.S.C. § 1331 because this claim arises under the laws of the United States as a

claim against a federally created corporation. Memorandum Opinion and Order, at

footnote 4 on pages 6-7, *Thacker, et al. v. Tennessee Valley Authority*, 5:15-cv-

01232-AKK (April 9, 2021), quoting *Monsanto Co. v. Tenn. Valley Auth*., 448

F.Supp. 648, 651 (N.D. Ala. 1978).

12.     Venue is proper in this district under 28 U.S.C. § 1391 because a

substantial part of the events or omissions giving rise to this claim occurred in this

district and division, specifically in Jackson County, Alabama.

## APPLICABLE LEGAL PRINCIPLES AND FACTS

13.     This lawsuit arises out of a deadly and totally unnecessary fire which

occurred on or about January 27, 2020, on Dock B at the Jackson County Park and

Marina. This event involved the unnecessary deaths, injuries to, and property

losses of many people, including the named Plaintiffs herein. These deaths,

injuries, and property losses were the proximate result of the negligent and/or

wanton conduct of Defendant.

14.    Under the circumstances of this case, the TVA can be sued in its own name. *Thacker v. Tennessee Valley Authority*, 139 S.Ct. 1435, 1440 (2019). In fact, when the conduct is commercial in nature – the kind of thing any power company or landowner might do – the TVA cannot invoke sovereign immunity. The TVA is liable to the same extent as a private party. *Id*. at 1444. Here, the TVA acted as a landowner and/or landlord and/or lessor and was involved in commercial activity such as any landowner and/or landlord and/or lessor would engage, including inspecting Dock B for deficiencies which endangered people such as Plaintiffs.

15.    In 1963, like other landowners, TVA deeded certain real property to Jackson County, Alabama. See Exhibit 1. This property became known as the Jackson County Park and Marina (the Park). However, TVA carved out a slip of land between the Park and the waterline of the Tennessee River which the TVA continued to own. On information and belief, some of the Park is located on property deeded to Jackson County and some of the Park is located on property which TVA continues to own.

16.    In paragraph 2(e) of the deed, TVA reserved its right to enter upon the Park, structures, improvements, and any of the land to perform inspections. In paragraph 4 of the deed, TVA reserved the requirement that grantee Jackson County must obtain TVA's approval of any structures or improvements constructed or to be constructed by the grantee. TVA required such approvals to be

5

obtained pursuant to and in compliance with established procedures under Section 26a of the Tennessee Valley Authority Act of 1933.

17.     In the deed, TVA specifically allowed members of the general public who used the Park and its boat docks to be charged fees consistent with generally accepted practices in the operation of public commercial boat harbors, docks, or other public commercial recreational purposes. See Exhibit 1 at page 10.

18.     Importantly, TVA agreed in the deed, specifically in paragraph 6, that it was liable for personal injuries, property damage, or loss of life or property caused by TVA's own negligence.

19.     Furthermore, TVA designated 18.72 acres of the Park as a Zone 6 Recreation Parcel. See Exhibit 2. Zone 6: Developed Recreation includes all reservoir land managed for concentrated, active recreational activities that require capital improvement and maintenance, including, TVA public land under easement, lease, or license to other agencies/individuals for recreational purposes and TVA public land fronting land owned by other agencies/individuals for recreational purposes. See Exhibit 3 at page 2. Additionally, types of development and facilities that can occur or exist on public recreation land typically include marina facilities owned by the public entity. See Id. On information and belief, this 18.72-acre tract is shown in the color red on TVA's publicly available recreation map. See Exhibit 4. Because of the importance of TVA public land, and just like

6

any other landowner, it is TVA's duty to: (1) prevent abuse and destruction of the public land it manages; and (2) take necessary steps to remedy unauthorized uses and encroachments. TVA has been charged by Congress to provide for the proper use of marginal lands and to fulfill land and shoreline management responsibilities. The TVA Board of Directors recognizes the importance of TVA public land and TVA's duty to manage it wisely for present and future generations. In fact, TVA's policy is to manage its land and resources to provide for appropriate public use and enjoyment of TVA public land and to prevent abuse and destruction of TVA public land and resources. See Exhibit 5.

20.    In or around 1999, Dock B was constructed at the Park. It had to be approved by the TVA through what is commonly referred to as the Section 26a permitting process.[1] Dock B was a fixed and covered dock.

21.    At all pertinent times, it is believed Dock B was owned, managed, and/or controlled by Defendant, the Tennessee Valley Authority. At all pertinent times, it is believed Dock B was supposed to be maintained and operated in accordance and compliance with the safety-related rules, regulations, and

---

[1] Section 26a of the TVA Act provides that:

> [N]o dam, appurtenant works, or other obstruction, affecting navigation, flood control, or public lands or reservations shall be constructed, and thereafter operated or maintained across, along, or in the [Tennessee] river or any of its tributaries until plans for such construction, operation, and maintenance shall have been submitted and approved by the [TVA].

16 U.S.C. § 831y–1. Channeling its authority under the Act, TVA has issued detailed regulations outlining the permitting process for the construction of structures, facilities, and other uses that fall under Section 26a. See 18 C.F.R. §§ 1304.1–1304.11 (2012).

guidelines of the TVA, the International Fire Code, the National Fire Protection Association including NFPA 303, the National Water Safety Congress, and/or the National Electric Code.

22.    Therefore, TVA owned the shoreline area of the Park, including the dry land and/or the land under the waters of the Tennessee River upon which Dock B was located. As such, TVA was the authority having jurisdiction over the property in question and owed duties to protect the public from harm when they used that property.

23.    As early as 2008, TVA met with representatives of Jackson County about operating the Park in a safe manner to protect people like Plaintiffs who used the Park. Defendant performed a walk-through inspection. Additionally, TVA established standard safety practices for managing such Parks that would address public safety and other generally accepted practices for operation of such Parks. TVA required Jackson County to abide by such safety standards, stating that the standards applied to the Park to ensure the conditions of the 1963 deed were met. See Exhibit 6.

24.    As early as 2009, TVA acknowledged it had safety agreements with Park operators such as Jackson County. TVA also announced it would achieve these safety goals by, among other steps, inspecting the Park every year. These annual inspections would be performed to assess whether Jackson County was

meeting the industry safety standards. In fact, TVA provided a copy of these industry standards to Jackson County. See Exhibit 7.

25.     TVA also announced its goal to ensure that Park operations, including those located on TVA land, were safe for the general public like Plaintiffs. TVA instituted this goal because it had identified electrical safety issues at such Parks which put users of structures such as boat docks at risk. In fact, TVA even demanded that Jackson County provide TVA with signed documentation from a certified electrician stating the electrical systems on TVA property, like the boat docks, met applicable National Electric Code safety standards. See Exhibit 7 and Exhibit 8. TVA even clarified that the certified electrician had to inspect the electrical service located on any TVA property used as part of the Park's operation and that the electrical system had to meet the standards of the National Electric Code and all other applicable laws, ordinances, and regulations. See Exhibit 7 and Exhibit 8. Such an inspection and certification letter, specifically referencing the docks at the Park, was prepared; and thereby shows that the docks, specifically including Dock B, are TVA property. See Exhibit 9.

26.     TVA also performed annual inspections at the Park related to its "Clean Marina" program. These inspections required TVA to make sure boats at the Park marina met state regulations for navigability. TVA therefore knew, or should have known, many boats at Dock B were not navigable. These inspections

also required the marina and docks in the Park to meet applicable design and maintenance safety standards. See Exhibit 10. TVA's inspections allowed TVA to have every opportunity to know that Dock B had an electrical system which created fire hazards. Alternatively, TVA should have known such fire hazards existed. These inspections also allowed TVA to know Dock B's roof was not designed and built to have fire and smoke vents or burn-out panels, the intended purpose of which was to slow and stall the progression of deadly fires so people could have time to escape such fires. Alternatively, TVA should have known of these design and construction flaws. Likewise, TVA's inspections allowed it to know that Dock B did not have an escape boat or safety skiff for people to leave Dock B in the event of a fire. Alternatively, TVA should have known there was no escape boat.

27.    Further, it is believed that TVA voluntarily asserted its right to inspect the premises of the Park and Dock B to discover, monitor, and/or correct any existing or potential flaws, hazards, and/or deficiencies in both design and/or maintenance safety standards of the premises and regulations for navigability. In asserting its right to inspect, TVA voluntarily assumed a duty to perform said inspections in a competent manner. These inspections were intended to identify, eliminate, guard against, and/or warn about said potential flaws, hazards, and/or deficiencies and allowed TVA the knowledge and ability to address any and all fire

safety hazards that were or which could have been observed. It is believed the

inspections were supposed to be done with reasonable care, and that TVA was to

report any flaws, hazards, and/or deficiencies which were observed and

appreciated, or which should have been observed and appreciated to an appropriate

authority. It is also believed that TVA was to make such reports with the

promptness commensurate with the degree of danger perceived or which should

have been perceived, and that any corrective action within the TVA's gambit of

authority or within the scope of its undertaking should have been, but were not,

instituted with appropriate haste. By voluntarily undertaking the duty to perform

these inspections and failing to adequately report its findings, TVA is liable for its

own conduct. Additionally, and/or alternatively, TVA is vicariously liable for the

failings of Jackson County. Thus, TVA is not immune from suit for its engagement

in commercial activity. Like a commercial business, TVA undertook to maintain

this property for the benefit of paying customers. The causes of this fire and ways

to protect against the fire once it started were within the purpose of these

inspections; and the inspectors were obligated to and should have reported their

findings to an appropriate authority. Therefore, TVA assumed a duty by

voluntarily undertaking inspections and the scope of the duty included a survey of

Dock B and associated electrical and fire hazards; the duty was owed to tenants

and users of Dock B and/or users of boats docked at Dock B such as Plaintiffs; this

duty was breached by failure to recognize the unsafe character of Dock B; and the deaths, injuries, and property losses in question suffered by Plaintiffs occurred as a proximate result of the breach of this duty and TVA's failure to exercise reasonable care in performance of the duty.

28.    In or around April 2009, Dock B and the Park were destroyed and/or heavily damaged by a windstorm or tornado. As a result of this damage, Dock B was repaired and/or rebuilt in or around 2009 and 2010. Once again, Dock B had to be approved by the TVA through the Section 26a permitting process. As rebuilt, Dock B once again was a fixed and covered dock. On information and belief, Dock B had 36 boat slips.

29.    In August 2009, Defendant reminded Jackson County Park to provide Defendant with a report from a certified electrician of the inspection of the electrical service located on TVA property the Park was using as part of recreation operation, and that it met the standards of the National Electric Code.

30.    To the extent Defendant contends that Dock B was not required to be built, rebuilt, wired, rewired, maintained, and operated in accordance and compliance with the safety-related rules, regulations, and guidelines of the TVA, the International Fire Code, the National Fire Protection Association including NFPA 303, the National Water Safety Congress, and/or the National Electric Code, then these rules, regulations, and guidelines constituted the best practices and

12

guidelines for the marina industry and should have been used by Defendant in all aspects of building, rebuilding, wiring, rewiring, maintaining, and operating Dock B.

31.     Defendant had the duty and responsibility to make sure Dock B was maintained and operated in accordance and compliance with the safety-related rules, regulations, and guidelines of the TVA, the International Fire Code, the National Fire Protection Association including NFPA 303, the National Water Safety Congress, and/or the National Electric Code. Alternatively, if Defendant contends any of these safety practices did not actually apply to Dock B, then Defendant had the duty and responsibility to make sure these safety-related rules, regulations, and guidelines constituted the best practices and guidelines for the marina industry which should have been used by Defendant in all aspects of building, rebuilding, wiring, rewiring, maintaining, and operating Dock B.

32.     Furthermore, years after TVA instituted its inspections and safety standards, the docks in the Park continued to be dangerous. Regarding the electrical systems, TVA knew or certainly should have known that at least one engineer had determined the electrical system on Dock A did not meet NEC requirements for this type of marina installation; that boat owners were complaining about poor electric service in the marina; that Jackson County had rejected bids to fix Dock A on at least two occasions; that Dock A needed to be

fixed; and that Dock B needed further inspections and repairs to ensure its

electrical system was in compliance with the Code and no longer posed any danger

to boaters or the general public. See Exhibit 11. In fact, TVA was intimately

involved in reviewing the project to perform such electrical work throughout the

Park and was exercising its right and power to require changes in the electrical

systems and ultimately to approve those electrical systems. See Exhibit 12.

33.     The events, acts and circumstances giving rise to this action all

occurred on the navigable waters of the United States involving non-seafarers who

perished or were injured or damaged in the state territorial waters of Alabama

while engaged in personal, non-commercial activities during traditional maritime

activity.

34.     The Marina and Plaintiffs' vessels were in navigable waters and

within the territorial waters of the State of Alabama.

35.     Multiple vessels moored at Dock B sank. While moored at Dock B at

the Marina, all vessels were within the navigable waters of the United States.

Upon information and belief, all vessels docked at Dock B were pleasure boats, not

used to carry goods or passengers.

36.     These events took place in the territorial waters of the State of

Alabama.  Plaintiffs individually, and for Plaintiffs Decedents invoke the general

maritime law, including its comparative fault analysis, as well as remedies under the laws of Alabama.

37.    At the time of the subject incident, Plaintiffs and Plaintiffs' Decedents were not (1) a Jones Act seaman, (2) a longshoreman or person otherwise employed in a maritime trade under the Longshore Harbor Workers Compensation Act or (3) subject to the Death on High Seas Act.  As such, Plaintiffs and Plaintiffs' Decedents were non-seafarers and fall within the so-called Yamaha exception established by the United Supreme Court in 1996. This status allows the Plaintiffs and the estates of the Plaintiffs' Decedents to recover under both general maritime law as well as the state court remedies available under the laws of the State of Alabama.

38.    Prior to the fire of January 27, 2020, Defendant failed to comply with the safety-related rules, regulations, and guidelines, the International Fire Code, the National Fire Protection Association including NFPA 303, the National Water Safety Congress, and/or the National Electric Code. Alternatively, Defendant had the duty and responsibility to make sure these safety-related rules, regulations, and guidelines constituted the best practices and guidelines for the marina industry which should have been used by Defendant in all aspects of building, rebuilding, wiring, rewiring, maintaining, and operating Dock B.

39.     In fact, NFPA 303 is a section of published fire safety standards for marinas and boatyards. The industry standards in NFPA 303 provide guidance on electrical equipment, berthing and storage of boats, annual electrical inspections, marina employee fire response training, biannual fire drills, and marina owners and operators having a fire department liaison who is responsible for submitting and gaining approval of a pre-fire plan to the local fire department.

40.     Additionally, the National Water Safety Congress was established with the goal to further water safety and developed "Guidelines for the Safe Operation and Maintenance of Marinas." These NWSC Guidelines were revised as recently as 2001 and have guidelines which are similar to the requirements of NFPA 303. Similar NWSC guidelines which should be used in the marina industry include employee fire training, annual electrical inspections, engagement with local fire departments, and having a safety skiff to tow a vessel that may be on fire to open water away from other watercraft or structures.

41.     Without limiting the allegations or the evidence, the following facts and conditions existed in the relevant time prior to the fire:

a.      The electrical wiring system for Dock B was supposed to comply with the 2008 National Electrical Code but did not;

b.    The electrical wiring system for Dock B should have complied with the best practices and guidelines for the marina industry such as the 2008 National Electrical Code but did not;

c.    As a result of Defendant's conduct, at least the following deficiencies existed in the electrical wiring of Dock B:

    i.    The two breaker boxes for Dock B used residential quality breakers, rather than using proper water-resistant breakers for a wet environment.

    ii.    Approximately 1 or 2 weeks before the fire, Carl Barnes—while acting in his capacity as an employee of Jackson County and the manager of the Park—used a hammer to force a 55 Amp breaker into the slot in the breaker box which serviced the boat slip in which the Dixie Delight was berthed. Oversized breakers can cause excessive heating of wires which can result in melting, arcing, and fires.

    iii.    Electrical sockets servicing each boat slip on Dock B failed to have any ground fault interrupters or "GFIs," even though each boat slip should have had one. Accordingly, none of the slips had or were fitted with GFIs.

iv.  Each of the 36 boat slips on Dock B had a meter box used to measure electrical usage for each slip, but these meter boxes were not waterproof. This failure to use proper waterproof meter boxes, coupled with the lack of GFIs, would have allowed moisture, damage, and/or the development of electrical shorts and shocks.

d.  Dock B had at least the following deficiencies:

i.  The roof of Dock B did not have any fire and smoke vents or burn-through panels in it. Such vents or panels are designed and used to allow fire to escape through the breakout spots, thereby slowing the spread of the fire. The lack of break out spots thereby increased the speed with which the fire could spread.

ii.  Defendant failed to provide boaters at Dock B with guidance on electrical equipment and issues, failed to perform proper annual electrical inspections, failed to provide marina employees with fire response training, failed to hold bi-annual fire drills for its employees and the boaters; and failed to have a liaison with the local fire department who was responsible to develop a pre-fire plan and have it approved by the appropriate fire department personnel.

18

  iii. Defendant failed to have a safety skiff at Dock B which could have been used to tow a vessel that may be on fire to open water away from other watercraft or structures and/or which could serve as a means of escape from a burning dock.

  iv. Defendant allowed non-operational boats and gas grills on Dock B. One of the non-operational boats was the Dixie Delight, which subsequently caught fire. The Dixie Delight had been berthed at Dock B for years. Jackson County Park actually foreclosed on the Dixie Delight, and after becoming the owner of the Dixie Delight, then sold it to the man who then sold it to Plaintiff Tim Parker.

42. Defendant's lack of management over its property caused the following:

  a. Overheating of electrical wires on Dock B as evidenced by crystallization on those wires, all of which was a fire threat;

  b. People on Dock B experiencing electrical shocks or currents evidencing a lack of grounding of the electrical system, all of which was a fire threat;

19

c.      Ungrounded wires which could therefore overheat and/or cause arcing of electricity, all of which was a fire threat and/or a threat to overheat adjoining surfaces until they caught fire;

d.      A fire threat was created by the failure to properly repair the electrical system of Dock B and/or to actually force improper and wrong-sized breakers into at least one breaker box that serviced Dock B in the days leading up to the fire in question;

e.      Allowing electrical power to continue to flow into the Dixie Delight when proper wiring and breakers would have prevented such from happening, all of which was a fire threat;

f.      The likely development of the fire originating in the bulkhead between the electrical panel of the Dixie Delight and its storage closet;

g.      Inadequate training and supervision of Jackson County employees in the Park which resulted in boats being permanently moored at Dock B for approximately 10 years in inoperational shape so that they could not be untied from the dock and/or could not be moved from their slips in the event of fire, all of which was a threat to the lives and safety of persons and property;

20

h.      An abundance of combustible materials on the decks of vessels and
        open dock areas, along with the presence of propane tanks, all of
        which increased the fire load of Dock B;

i.      A lack of measures and guidelines in place to prevent and mitigate fire
        events for all moored boats and their occupants;

j.      A lack of personal flotation devices or life rings located on Dock B
        for use in an emergency situation like a fire;

k.      A lack of observance of existing safety best practices and guidelines
        which had been created for and used by the marina industry, including
        but not limited to the following: (1) annual electrical inspections, (2)
        employee fire training, (3) regular fire drills, (4) the development of a
        pre-fire plan with the local fire department which would have better
        prepared marina staff and/or boat owners for a vessel or dock fire, (5)
        the poor design and/or lack of break out spots in the roof of Dock B
        which resulted in more rapid spread of the fire in question, and/or (6)
        the lack of a safety skiff per industry guidelines which could have
        been used by marina staff and/or first responders and/or occupants of
        Dock B to respond to the emergency situation;

l.      The rapid spread of the fire from boat to boat and to and along the
        entire Dock B with no breakout spots to slow the spread;

m.   An inability to untie the mooring ropes of the Dixie Delight so that the Dixie Delight could be removed from Dock B and the proximity to the other vessels;

n.   An inability to untie the mooring ropes of the other vessels so that they and occupants of Dock B could be removed from Dock B and their proximity to the Dixie Delight;

o.   The lack of a safety skiff which could have been used to either (1) tow the Dixie Delight away from Dock B and the other vessels and/or (2) provide a means of egress from Dock B and the fire for the occupants of Dock B that night;

p.   An inferno which not only engulfed Dock B and the vessels moored there, but which also created a vortex of winds which drew inoperational boat(s) upon which people attempted to escape back into the inferno;

q.   Deaths of numerous people by fire, drowning, and/or smoke inhalation;

r.   Personal injuries to others; and

s.   Property loss and damages.

43.   The Alabama Recreational Use Statute (ARUS) does not provide defenses to TVA in this case. These statutes only protect landowners who open

22

their land to non-commercial, recreational use. *Thacker v. TVA*, at page 7 (citations omitted). Here TVA engaged in commercial conduct like any other landowner: deeding land to another party to be used for the commercial purpose of running a park, charging rent for boat slips, selling gas to boats, and granting a license to that party to actually use the TVA's adjacent property as part of that commercial enterprise. Specifically, Dock B was used for the commercial purpose of leasing boat slips to paying customers, and the Park itself was operated like any other business venture that charged for camping, use of boat ramps, fuel for boats, and/or other amenities.

44.    Furthermore, TVA is liable under the ARUS for willful or malicious failure to identify, eliminate, guard or warn against a dangerous condition, use, structure, or activity; for injuries and harm suffered where permission to camp was granted for commercial enterprise for profit; and/or injuries and harm caused by acts of persons to whom permission to camp was granted to third party persons as to whom the person granting permission or the owner, lessee, or occupants of the premises owed a duty to keep the premises safe or to warn of danger. *Thacker v. TVA*, at page 9, footnote 9, citing Ala. Code 1975 §35-15-3. Approving and allowing Dock B to be built and maintained in such a dangerous fashion constitutes such willful and malicious failures, and permission to live or camp on boats at Dock B was a commercial enterprise for profit.

45.     Additionally, and/or alternatively, TVA is liable under ARUS when, as here, it has actual knowledge of (1) a dangerous condition, use, structure, or activity; (2) that the condition, use, structure, or activity is not apparent to the person or persons using the outdoor recreational land; and (3) that having this knowledge, TVA chooses not to guard or warn in disregard of the possible consequences. *Thacker v. TVA*, at pages 10-11, citing Ala. Code 1975 §35-15-24(a).

## COUNT ONE
## NEGLIGENCE

46.     Plaintiffs adopt all preceding paragraphs and incorporate them by reference as if fully set forth herein.

47.     Defendant owed a duty to Plaintiffs not to allow unreasonably dangerous conditions to exist at Jackson County Park, including duties to inspect for, identify, eliminate, maintain, repair, guard against, and warn about such hazards.

48.     Defendant owed a duty to Plaintiffs to prevent abuse and destruction of the public land it manages, and Defendant also owed Plaintiffs a duty to take necessary steps to remedy unauthorized uses.

49.     Defendant owed Plaintiffs a duty to provide for appropriate public use and enjoyment of TVA public land.

24

50.     Defendant owed Plaintiffs a duty to not act in a negligent or negligence per se fashion.

51.     Defendant negligently breached its duties to Plaintiffs in one or more of the following aspects:

a.     Defendant failed to exercise reasonable care to inspect and maintain a reasonably safe premises for use by those persons lawfully on the premises;

b.     Defendant breached its duties to identify and eliminate hazards known or which should have been known to Defendant;

c.     Defendant breached its duty to guard against known hazards, or hazards which should have been known to them, until they were eliminated;

d.     Defendant breached its duty to warn Plaintiffs of defects and dangers associated with the premises about which Defendant knew, should have known, and/or about which it had superior knowledge;

e.     Defendant breached its duty to be reasonably sure that it was not inviting another into a situation of danger or peril;

f.     Defendant failed to construct, design, maintain and/or repair the premises in such a manner so as not to constitute a hazard to those persons on the premises;

g.      Defendant failed to inspect, remove, or alter conditions on the premises which were likely to cause injury or damage;

h.      Defendant failed to identify, or remedy known or foreseeable hazards; Defendant caused or allowed a hazard to occur on January 27, 2020.

52.     As a direct and proximate result of the negligent actions and/or inactions and/or negligence per se of Defendant, Plaintiffs suffered loss of life, personal injuries, and/or property damage. Plaintiffs demand judgment against Defendant for such compensatory damages as the fact finder deems just under the circumstances. Plaintiffs demand judgment against Defendant in an amount sufficient to fairly and reasonably compensate them for the harm caused by the wrongful conduct of Defendant.

## COUNT TWO
## WANTONNESS

53.     Plaintiffs adopt all preceding paragraphs and incorporate them by reference as if fully set forth herein.

54.     Plaintiffs claim wantonness against Defendant, and that its acts proximately caused or contributed to damages claimed by Plaintiffs.

55.     Defendant owed a duty to Plaintiffs not to allow unreasonably dangerous conditions to exist at Jackson County Park, including duties to inspect for, identify, eliminate, maintain, repair, guard against, and warn about such hazards.

26

56.     Defendant owed a duty to Plaintiffs to prevent abuse and destruction of the public land it manages, and Defendant also owed Plaintiffs a duty to take necessary steps to remedy unauthorized uses.

57.     Defendant owed Plaintiffs a duty to provide for appropriate public use and enjoyment of TVA public land.

58.     Defendant owed Plaintiffs a duty to not act in a wanton fashion.

59.     Defendant wantonly breached its duties to Plaintiffs in one or more of the following aspects:

    a.     Defendant failed to exercise reasonable care to provide and maintain reasonably safe premises for use by those persons lawfully on the premises;

    b.     Defendant breached its duties to identify and eliminate hazards known or which should have been known to Defendant;

    c.     Defendant breached its duty to guard against known hazards, or hazards which should have been known to it, until they were eliminated;

    d.     Defendant breached its duty to warn Plaintiffs of defects and dangers associated with the premises about which Defendant knew, should have known, and/or about which it had superior knowledge;

27

e.   Defendant breached its duty to be reasonably sure that it was not inviting another into a situation of danger or peril;

f.   Defendant failed to construct, design, maintain and/or repair the premises in such a manner so as not to constitute a hazard to those persons on the premises;

g.   Defendant failed to inspect, remove, or alter conditions on the premises which were likely to cause injury or damage;

h.   Defendant failed to identify, or remedy known or foreseeable hazards;

i.   Defendant caused or allowed a hazard to occur on January 27, 2020.

60.   As a direct and proximate result of the wanton actions and/or inactions of Defendant, Plaintiffs suffered loss of life, personal injuries, and/or property damage.

61.   Plaintiffs demand judgment against Defendant in an amount sufficient to fairly and reasonably compensate them for the harm caused by the wanton conduct of Defendant and in an amount sufficient to preserve life, punish Defendant, protect the public, and prevent similar wrongs in the future.

**COUNT THREE**
**GENERAL MARITIME LAW NEGLIGENCE PERSONAL INJURY**
**SURVIVAL ACTION**

62.     Plaintiffs hereby reallege and adopt all of the foregoing paragraphs of the Complaint as if more fully set out herein.

63.     The personal injuries sustained by Plaintiffs' Decedents on January 27, 2020, were not caused by any fault on their part, but were caused by the negligence of Defendant, its agents, servants and/or employees.

64.     As a direct and proximate result of the negligence of Defendant, Plaintiffs' Decedents suffered great pain of body and anguish of mind and sustained other damages prior to their deaths as will be shown at trial.

65.     The negligent conduct of Defendant caused Plaintiffs' Decedents to undergo conscious suffering from the time of the injury until the time of their deaths on January 27, 2020.

66.     The personal injuries sustained by Plaintiffs' Decedents on January 27, 2020, were caused by the willful, wanton, reckless or grossly negligent conduct of Defendant, thereby entitling Plaintiffs to an award of survival damages under General Maritime law in amounts to be determined at trial, including but not limited to:

     a.     Pre-death pain and suffering;

     b.     Mental anguish prior to death;

     c.     Loss of enjoyment of life until the date of death;

     d.     Medical expenses from the date of diagnosis until death;

    e.     Loss of wages prior to death; and

    f.     Loss of future earning capacity;

    g.     Interest; and

    h.     Other survival damages allowed under General Maritime Law.

67.    As a direct and proximate result of Defendant's breach of its above-mentioned duties, Plaintiffs' Decedents suffered injuries, loss, damages and ultimately death.

68.    Plaintiffs, on behalf of the estates of Plaintiffs' Decedents, demand judgment against Defendant for all legally recoverable damages in such amount the fact finder deems just and proper, together with interest and costs.

## COUNT FOUR
## NEGLIGENCE RESULTING IN PERSONAL INJURY AND WRONGFUL DEATH UNDER GENERAL MARITIME LAW

69.    Plaintiffs hereby reallege and adopt all of the foregoing paragraphs of the Complaint as if more fully set out herein.

70.    This cause of action is brought pursuant to General Maritime Law.

71.    Plaintiff John Sanderson individually asserts a claim for personal injury because he suffered burns in the fire and was placed in the zone of danger by Defendant's acts and/or omissions.

72.     The deaths of Plaintiffs' Decedents on January 27, 2020, were not caused by any fault on their part, but were caused by the negligence of Defendant, its agents, servants and/or employees.

73.     As a direct and proximate result of the death of Plaintiffs' Decedents, Decedents' dependents lost pecuniary support. Plaintiffs are entitled to pecuniary damages under General Maritime Law, in amounts to be determined at trial, including but not limited to the following:

> a.     Loss of financial support;
>
> b.     Loss of service;
>
> c.     Loss of society;
>
> d.     Loss of fringe benefits;
>
> e.     Loss of inheritance;
>
> f.     Funeral and Burial expenses;
>
> g.     Interest; and
>
> h.     Other pecuniary damages allowed under General Maritime Law.

74.     As a direct and proximate result of the negligent conduct of Defendant, Plaintiff John Sanderson has incurred expenses for the medical, surgical, and/or hospital care and treatment for his injuries. Plaintiffs Paulk and

Roper, as Representatives of the decedents' estates, have incurred funeral expenses for Plaintiffs' Decedents.

75.    As a direct and proximate result of the negligent conduct of Defendant, Plaintiff Yancy Tyler Roper has suffered emotional distress and the loss of comfort, society, and companionship of Plaintiffs' Decedent Yancy Farrell Roper.

76.    Plaintiffs, individually and on behalf of the Estates of Plaintiffs' Decedents, demand judgment against Defendant for all legally recoverable damages as the fact finder deems just and proper, together with interest and costs.

## COUNT FIVE
## NEGLIGENCE RESULTING IN PROPERTY DAMAGE UNDER GENERAL MARITIME LAW

77.    Plaintiff hereby realleges and adopts all of the foregoing paragraphs of the Complaint as if more fully set out herein.

78.    Plaintiff Alvin Brown, individually, asserts a claim for property damage because he suffered property damage in the marina fire due to the destruction of his boat (including contents therein) (a **35' 3" 1982 Super-Barracuda Tri Hull Houseboat/Flybridge**) which was a total loss.

79.    Plaintiff Elford Burns asserts a claim for property damage because he suffered property damage in the marina fire due to the destruction of his boat (including contents therein) (a **35' 1964 Gibson Bayliner**) which was a total loss.

80.     Plaintiff Harrel Burns asserts a claim for property damage because he suffered property damage in the marina fire due to the destruction of his boat (including contents therein) (a **1985 Kayot**) which was a total loss.

81.     Plaintiff Bryan McGaha asserts a claim for property damage because he suffered property damage in the marina fire due to the destruction of his boats (including contents therein) (a **28' 1" 1992 Bayliner CIERA 2855 SB Cruiser; and a 36' 1976 Gibson Houseboat/Flybridge**) which was a total loss.

82.     Plaintiff Tim Parker asserts a claim for property damage because he suffered property damage in the marina fire due to the destruction of his boat (including contents therein) (a **30' 6" 1980 Sea Ray Vanguard Express SRV310**) which was a total loss.

83.     Plaintiff Wayne Waldrop asserts a claim for property damage because he suffered property damage in the marina fire due to the destruction of his boat (including contents therein) (a **34' 1972 Chris-Craft Catalina 33 Aqua-Home**) which was a total loss.

84.     As a direct result of the negligence of the Defendants, Plaintiffs are entitled to recover from Defendant reasonable and just compensatory, special and general damages as prayed for herein in the following non-exclusive respects: (a) economic losses and damages for the total loss and/or replacement of their vessels which was severely damaged; (b) loss of enjoyment of the vessel; (c) bodily

injuries; (d) past, present and future physical pain and mental anguish; (e) past, present and future lost wages and/or earning potential and (f) all other special and general damages as will be shown at the trial of this matter.

85.   Plaintiffs individually, demand judgment against Defendant for all legally recoverable damages in an amount in such amount as the fact finder deems just and proper, together with interest and costs.

## PRAYER FOR RELIEF

86.   Plaintiffs, individually and on behalf of the Estates of Plaintiffs Decedents demand judgment against Defendant and pray for the following relief.

87.   Plaintiffs are entitled to recover from Defendant reasonable and just compensatory, special and general damages as prayed for herein in the following non-exclusive respects: (a) economic losses and damages for the total loss and/or replacement of their vessels (including all contents therein) which were severely damaged; (b) loss of enjoyment of the vessels; (c) bodily injuries; (d) past, present and future physical pain and mental anguish; (e) past, present and future medical and pharmaceutical expenses; (f) permanent injuries; (g) past, present and future lost wages and/or earning potential and (h) all other special and general damages as will be shown at the trial of this matter.

88.   Plaintiffs pray that the fact finder grant Plaintiffs, individually and on behalf of the Estates of Plaintiffs' Decedents, relief to which they are entitled,

34

under the law, against Defendant, including court costs and attorney's fees, and any other relief this Honorable Court may deem necessary and proper.

Respectfully submitted this 5th day of January 2022,

/s/ **Kenneth B. Cole, Jr.**
Kenneth B. Cole, Jr. (ASB-0595-C56K)
Attorney for Plaintiffs

/s/ **Gary V. Conchin**
Gary V. Conchin (ASB-1263-C56G)
Attorney for Plaintiffs

/s/ **Brent H. Jordan**
Brent H. Jordan (ASB 5492-T71J)
Attorney for Plaintiffs

/s/ **Andrew F. Banks**
Andrew F. Banks (ASB-3344-I37O)
Attorney for Plaintiffs

/s/ **Malloray M. Diamond**
Malloray M. Diamond (ASB 6416-Q50N)
Attorney for Plaintiffs

**OF COUNSEL:**

CONCHIN, COLE, JORDAN & SHERROD
2404 Commerce Court SW
Huntsville, Alabama 35801
Phone: (256) 705-7777
Fax: (256) 705-7778
Email: kenny@alainjurylaw.com
Email: gary@alainjurylaw.com
Email: brent@alainjurylaw.com
Email: andrew@alainjurylaw.com
Email: malloray@alainjurylaw.com

*/s/ William  J. Parks, III*
William J. Parks, III (ASB-9748-K54W)
Attorney for Plaintiffs

**OF COUNSEL:**

WILL PARKS, P.C.
107 East Laurel Street
Scottsboro, Alabama 35768
Phone: (256) 574-1162
Fax: (256) 574-1167
Email: wparks@scottsborolawyer.com

**DEFENDANT TO BE SERVED VIA CERTIFIED U.S. MAIL**

Tennessee Valley Authority
Office of General Counsel
400 W. Summit Hill Drive
Knoxville, Tennessee 37902

*/s/ Kenneth B. Cole, Jr.*
OF COUNSEL