FILED

2026 Aug-13  AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| **GERALD PAULK,** *et al.*,<br>    Plaintiffs,<br><br>**v.**<br><br>**TENNESSEE VALLEY AUTH.,**<br>    Defendant. | **Case No. 5:22-cv-15-CLM** |
| **JOSEPH MILES,** *et al.*,<br>    Plaintiff,<br><br>**v.**<br><br>**TENNESSEE VALLEY AUTH.,**<br>    Defendant. | **Case No. 5:22-cv-105-CLM** |
| **TOMMY JONES,** *et al.*,<br>    Plaintiffs,<br><br>**v.**<br><br>**TENNESSEE VALLEY AUTH.,**<br>    Defendant. | **Case No. 5:22-cv-114-CLM** |

## <u>MEMORANDUM OPINION</u>

In these consolidated cases, a collection of Plaintiffs sue the Tennessee Valley Authority ("TVA") for its alleged failure to prevent and mitigate a tragic dock fire that claimed the lives of eight people, injured others, and caused extensive property damage.[1] TVA brings third-party claims against other entities it contends are at fault, including Jackson County, the City of Scottsboro, and the Electric Power Board of the City of Scottsboro ("SEPB") (collectively, the "third-party Defendants").

---

[1] All citations are to the lead case, *Paulk, et al. v. TVA* (5:22-cv-15-CLM), unless otherwise noted.

The parties now move for summary judgment and to exclude certain experts. The court outlines the pending motions below:

- TVA's motion for summary judgment on Plaintiffs' claims (doc. 314);
- TVA's motion to exclude Plaintiffs' expert Michael Pratt (doc. 316);
- TVA's motion to exclude Plaintiffs' expert Boris Datnow (doc. 318);
- Scottsboro's motion for summary judgment on TVA's third-party claims (doc. 320);
- TVA's motion to partially exclude Plaintiffs' expert John Frost (doc. 321);
- The third-party Defendants' motion to exclude Plaintiffs' expert John Frost (doc. 325);
- SEPB's motion for summary judgment on TVA's third-party claims (doc. 328);
- Jackson County's motion for summary judgment on TVA's third-party claims (docs. 330, 335);
- Jackson County's motion for joinder to TVA's motion to exclude Plaintiffs' expert Boris Datnow (doc. 332);
- Jackson County's motion to exclude Plaintiffs' expert Michael Pratt (doc. 333);
- TVA's motion to strike Michael Pratt and John Frost's affidavits (doc. 377); and
- Jackson County's motion for joinder to TVA's motion to strike (doc. 403).

For the reasons stated within, the court:

- **DENIES** TVA's motion for summary judgment on Plaintiffs' claims (doc. 314);
- **DENIES WITHOUT PREJUDICE** TVA and Jackson County's motions to exclude expert Michael Pratt (docs. 316, 333);
- **DENIES WITHOUT PREJUDICE** TVA's motion to exclude Boris Datnow (doc. 318);

2

- **DENIES AS MOOT** Jackson County's motion for joinder to TVA's motion to exclude Boris Datnow (doc. 332);
- **DENIES** Scottsboro's motion for summary judgment (doc. 320);
- **DENIES WITHOUT PREJUDICE** TVA and the third-party Defendants' motions to exclude John Frost (docs. 321, 325);
- **GRANTS** SEPB's motion for summary judgment (doc. 328);
- **DENIES** Jackson County's motion for summary judgment (docs. 330, 335); and
- **DENIES AS MOOT** TVA's motion to strike (doc. 377) and Jackson County's motion for joinder (doc. 403).

In separate orders, the court will set these claims for trial:

- **Plaintiffs' Count 2 Against TVA:** Wantonness Under Alabama Law (only for wrongful death Plaintiffs seeking punitive damages);
- **Plaintiffs' Count 3 Against TVA:** Negligence Personal Injury Survival Action Under General Maritime Law;
- **Plaintiffs' Count 4 Against TVA:** Negligence Resulting in Personal Injury and Wrongful Death Under General Maritime Law;
- **Plaintiffs' Count 5 Against TVA:** Negligence Resulting in Property Damage Under General Maritime Law;
- **TVA's Third-Party Count 1 Against Jackson County and Scottsboro:** Liability to Plaintiffs Under Federal Maritime Law and Federal Rules of Civil Procedure 9(h) and 14(c);
- **TVA's Third-Party Count 2 Against Jackson County and Scottsboro:** Contribution Under Federal Maritime Law.
- **TVA's Third-Party Count 3 Against Jackson County:** Indemnity;
- **Scottsboro's Third-Party Count 1 Against Tim Parker:** Contribution Under Federal Maritime Law; and
- **Jackson County's Third-Party Count 1 Against Tim Parker:** Contribution Under Federal Maritime Law.

## BACKGROUND

These cases arise from a fire that occurred on Dock B at the Jackson County Park and Marina. So the court starts by recounting what took place on Dock B before introducing the parties, their connections to these cases, and the motions at issue.

### A.    The Dock B Fire

Shortly after midnight on January 27, 2020, a fire broke out aboard the *Dixie Delight*, a 43-foot houseboat owned by Tim Parker.[2] At the time of the fire, the *Dixie Delight* was berthed in Dock B at the Jackson County Park and Marina.[3] The fire quickly engulfed the *Dixie Delight* and spread to neighboring vessels. Because Dock B was wooden and covered partially by a metal roof, the fire spread to the dock, too. The *Dixie Delight* was docked in one of the slips closest to the shore, thus preventing occupants further down the burning dock from reaching shore.

Parker was asleep onboard the *Dixie Delight* when the fire broke out. After Parker awoke and saw the fire, he and a nearby boat owner attempted to extinguish it, but their efforts failed. Parker called 911 roughly three minutes after he discovered the fire, and emergency responders were dispatched to the Dock.

In the meantime, chaos ensued. One person trapped on Dock B managed to escape on a kayak. Sixteen others tried to evacuate on two boats at the end of the Dock: 12 on one, four on another. But neither boat's engine started, forcing the occupants to paddle the boats away from Dock B using folding chairs and wash brushes. The fire continued to spread to other docked vessels. Those vessels burned and drifted, "creat[ing] a vortex-like suction that pulled the escape vessels back toward Dock B." (*See* doc. 342, p. 14). The escape boat carrying four individuals collided

---

[2] Plaintiffs and Jackson County dispute where the fire originated on the *Dixie Delight*. Plaintiffs contend that the fire originated on the ship's bulkhead (the inner walls within the hull of the ship).

[3] The parties dispute the precise slip the *Dixie Delight* was in at the time of the fire. More on that later.

4

with a burning boat, so all four occupants were forced to jump into the water. Soon after, a different burning boat struck the other escape vessel. Five occupants jumped into the water. (*See id.*; *see also* doc. 57-1, p. 53). The seven remaining occupants, which included five children, their mother, and another woman, could not escape and perished. Of the nine people who entered the water that night, eight reached the shore or were rescued and one drowned. In total, eight people died and one other suffered serious injuries.

## B.    Dock B's Electricity

There were 38 slips on Dock B, and the slips were connected to breaker boxes and meter bases. The breaker boxes delivered electricity from power lines at the Park and Marina to the boat slips, and the meter bases measured the electricity feeding into the boat slips. The *Dixie Delight* was connected to one of these breaker boxes when it caught fire.

## C.    The Parties

Plaintiffs include (1) owners of vessels which were regularly moored and berthed in leased Dock B slips, (2) overnight guests of the vessel owners, and (3) the legal representatives of such guests. Plaintiffs seek money damages for deaths, personal injuries, and property losses caused by the fire.

Plaintiffs sue TVA. TVA is a corporate agency and instrumentality of the United States, created by the TVA Act of 1933, as amended, 16 U.S.C. §§ 831-831ee. TVA is statutorily charged with, among other things, "'[t]he unified development and regulation of the Tennessee River system,' including the Guntersville Reservoir, as agent for the United States." *TVA v. Walcott*, 611 F. Supp. 3d 1328, 1333 (N.D. Ala. 2020) (citing 16 U.S.C. § 831y-1). Plaintiffs contend that TVA exercised control over the Jackson County Park and Marina—and by extension Dock B—such that TVA owed them a duty of reasonable care.

TVA brings third-party claims against Jackson County, Scottsboro, and SEPB. Jackson County owns the Park and Marina where Dock B was

located. Jackson County owned, operated, and maintained Dock B. It also leased Dock B boat slips to boat owners (like some of our Plaintiffs). Scottsboro is the city in Jackson County where the Park and Marina is located. Scottsboro, through its fire marshal, performed fire safety inspections at the Park and Marina. SEPB is a public corporation that provides electrical services in Scottsboro. SEPB supplies power to the Park and Marina and did so at the time of the fire.

## D.   Pertinent Property Rights

The Park and Marina is located on the Guntersville Reservoir, which itself is a large impoundment on the Tennessee River in northeast Alabama. TVA acquired, through purchase and condemnation, real property outside the original river channel, as well as shoreline property. All property acquisitions were in the name of the United States.

In 1963, TVA deeded real property from the United States to Jackson County via an indenture. The real property consisted of a 77-acre parcel and easement rights below a 600-foot contour line to and over the waters of the Guntersville Reservoir. The easement rights allowed Jackson County to construct and maintain piers, docks, and similar water-use facilities on the easement area and where the easement area immediately abuts. But TVA retained custody and control of all property below the 600' contour line. (*See* docs. 315-1, pp. 2-3; 323-32, p. 63; 323-31, p. 33).

The 1963 Indenture gave TVA the following right:

> [TVA may] enter upon … all portions of the fee parcel and easement area and upon and into all buildings, structures, improvements, and facilities for the purpose of inspecting said lands, buildings, structures, improvements, and facilities and the operations of [Jackson County] thereon and therein.

(Doc. 315-1, p. 6). The Indenture also required that Jackson County "operate[]" and "develop[]" the easement area "with generally accepted

6

standards for the … public recreational uses." (*Id.* at p. 10). And if Jackson County breached that requirement, TVA reserved "the right to re-enter and take possession of any and all of the lands, interests, and rights" transferred to Jackson County. (*Id.*). David Brewster, who worked for TVA as a land permitting specialist, confirmed that TVA owned the land below the 600-foot contour. According to Brewster, Jackson County only had the right to use the area where the Park and Marina is located because of the easement. (*See* doc. 323-31, p. 33).

Below is a general map of the Park and Marina with Dock B circled:



(Doc. 193, p. 4) (circle added). The United States owns the subsurface lands under Dock B and the navigable waters that surround it. Those lands and waters are "entrusted to [TVA] as the agent of the United States to accomplish the purposes of [the TVA Act]." 16 U.S.C. § 831c(h).

**E.    Jackson County's § 26a Permit and Construction of Dock B**

Jackson County built Dock B in or around 1999. But before it could, TVA had to approve construction through the "Section 26a permitting process." Section 26a of the TVA Act, as amended, provides that:

> no dam, appurtenant works, or other obstruction, affecting navigation, flood control, or public lands or reservations shall be constructed, and thereafter operated or maintained across, along, or in [the Tennessee River] or any of its tributaries until plans for such contraction, operation, or maintenance shall have been submitted to and approved by the [TVA] Board; and the construction, commencement of construction, operation, or maintenance, of such structures without such approval is prohibited.

16 U.S.C. § 831y-1. TVA's implementing regulations at 18 C.F.R. § 1304.204 provide a process for persons (like Jackson County) seeking approval for the construction of structures covered by § 26a. These regulations specifically apply to boat docks and state that any "power lines, poles, electrical panels, and wiring" must be installed "[i]n a way that would not be hazardous to the public" and "[i]n compliance with all State and local electrical codes …" 18 C.F.R. § 1304.301(a). The regulations also provide that "TVA's issuance of a [§ 26a] permit does not mean that TVA has any duty to make such a determination." *Id.* at § 1304.301(c). The regulations say that if any approved structure "is not kept in a good state of repair and in good, safe, and substantial condition" and the structure owner fails to remedy the situation after notice from TVA, then TVA may cancel the permit. 18 C.F.R. § 1304.406.

In response to applications from Jackson County, TVA first permitted Dock B in 1999 and then re-permitted it with superseding § 26a permits in 2010 and 2017. Jackson County's § 26a permit from 2017 provides "general and standard conditions." General conditions (5) and (6) read:

8

> (5) In issuing this Approval of Plans, TVA assumes no liability and undertakes no obligation or duty (in tort, contract, strict liability or otherwise) to the applicant or to any third party for any damages to property (real or personal) or personal injuries (including death) arising out of or in any way connected with [Jackson County's] construction, operation, or maintenance of [Dock B] which is the subject of this Approval of Plans.
>
> (6) This approval shall not be construed to be a substitute for the requirements of any federal, state, or local statute, regulation, ordinance, or code, including, but not limited to, applicable building codes, now in effect or hereafter enacted …

(Doc. 315-3, p. 5) (cleaned up).

Jackson County was, at all relevant times, the operator of Dock B and its mooring facilities. Jackson County constructed, maintained, and operated Dock B for the "purpose of leasing boat slips to paying customers." Jackson County built and operated Dock B under the 1963 Indenture's easement rights to "construct and maintain" under the 600-foot contour line and the County's Section 26a permit. (*See* doc. 315-1, p. 2; doc. 315-2, p. 1).

## F.    TVA's Inspections, Clean Marina Initiative, and the Campground Compliance Initiative

That Jackson County maintained and operated Dock B, however, did not mean that TVA had no presence on, or oversight of, Dock B.

1. *Inspections:* To ensure that Jackson County abided by its § 26a Permit requirements, TVA periodically conducted waterborne shoreline inspections around Dock B to identify violations. According to TVA, these violations would include things like unpermitted obstructions affecting navigation, flood control, or public lands. (*See* doc. 315-4, p. 2). TVA adds that it performed these § 26a shoreline inspections every five years. The

last inspection TVA conducted before the fire was in March 2016. Carl Marona, the Park and Marina manager from 1979 to 2008, testified that TVA representatives "would ride through [the Park and Marina] occasionally, and if they found something that maybe was displeasing to them" then they "gave [Marona] instructions on what [Marona] needed to do." (Doc. 323-10, pp. 7–8, 19). According to Marona, he could not refuse requests and instructions from TVA because it owned the easement area where Dock B was located.

2. *The Clean Marina Initiative:* The Park and Marina participated in TVA's Clean Marina Initiative ("CMI"). The CMI is "a voluntary program … to promote environmentally responsible marina and boating practices." (Doc. 315-6, p. 9). To become a TVA-certified Clean Marina, a marina must conduct a self-assessment using the current Clean Marina checklist. After that, the marina must request an "endorsement visit" from a TVA watershed team member. The team member will review the self-assessment with the marina, and, if necessary, identify areas where improvements are needed based on the checklist and develop a plan of action. Some of the items in the self-assessment checklist are mandatory. Some are optional. As relevant here, the Clean Marina checklist requires certified marinas to "[h]ave accessible, current, written emergency response plans for likely threats," including fires. (Doc. 255-6, pp. 40–41). The checklist also requires marinas to "[c]omply with … National Fire Protection Association (NFPA) petroleum handling and storage requirements." (*Id.* at p. 24). According to the checklist, the NFPA requirements include things like: having available and clearly marked fire extinguishers throughout the marina; training personnel on fire safety and response; providing ready access to all piers, floats, and wharves for municipal firefighting equipment; and asking the local marshal to visit the marina each year to train employees and familiarize himself with the facility. (*Id.*).

Once a marina passes a TVA inspection, TVA will certify the marina, give it a "Clean Marina" flag to fly at the facility, and list the marina on TVA's website as a Clean Marina. And after a marina is

certified, the marina may elect to maintain its Clean Marina status by completing the self-assessment after two years and then every four years thereafter. TVA will conduct endorsement visits for the re-certifications. The Jackson County Park and Marina received its first Clean Marina certification in 2004. And in April 2016, the Park and Marina received a renewed Clean Marina certification for March 2016 to March 2020. (*See* doc. 315-5, p. 2). According to Carl Barnes (the Park and Marina's manager at the time of the fire), TVA would inspect the electrical systems on Dock B each time TVA representatives visited the Park and Marina to conduct CMI inspections. (*See* doc. 315-13, pp. 76–77).

3. *The Campground Compliance Initiative:* In 2006, TVA began a program called the Campground Compliance Initiative ("CCI"). TVA designed the CCI to "[d]evelop a comprehensive process that will provide consistent guidance for the monitoring and enforcement of both existing and new contracts with operating partners of public and commercial campgrounds on TVA managed land." (Doc. 388-3, p. 6). Jackson County participated in the CCI.

To enforce the CCI, TVA sent inspectors to all recreational operations on TVA property, including marinas. The inspectors would grade those operations on a scorecard. The scorecard included a section for "boat ramps" and "boat slips" and asked: "[a]re there current or imminent threats to public safety related to electrical hazards?" (Doc. 336-3, p. 81). TVA employee Steve Turpin developed "electrical hazard red flags" for TVA inspectors to look for. These red flags included things like ensuring there are no "openings in inner covers" of breaker panels. (*See* doc. 323-38, pp. 50–51). TVA inspected the Park and Marina in 2009, 2011, 2012, and 2013 pursuant to its CCI. (*See* doc. 323-33, p. 44).

On April 30, 2009, TVA representative Sabrina Melton sent a letter to Marona to "update" the Park and Marina on TVA's "goals and planned activities … related to supporting the Tennessee River System as a desired recreation destination." (*See* doc. 187-7, p. 2). That letter included the below paragraph:

11

> Another goal is ensuring that all recreation operations located on TVA land are safe for the general public. Unfortunately, recently some electrical safety issues identified at a few operations has put recreational users at risk. In order to ensure recreational users are not at risk from electrical safety issues on operations located on TVA property, we are asking that operators, provide TVA with signed documentation from a certified electrician stating they have inspected the electrical system that is located on TVA property and certify it meets the standards of the National Electric Code (NEC).
>
> We would appreciate you providing this documentation to the following address within 60 days of receipt of this letter:

(*Id.*). As shown, TVA requested that Jackson County provide it with signed documentation showing that the Park and Marina's electrical systems complied with the National Electric Code. Around August 2009, TVA received confirmation from certified electricians that both the Park and Marina campgrounds and docks' electrical systems complied with NEC code. (*See* docs. 315-11; 187-9, p. 3). As best the court can tell, TVA did not regularly require such certifications.

### G.   Scottsboro's Fire Marshal Inspections

The City of Scottsboro also had a presence, although the parties dispute how much. The Park and Marina is located within Scottsboro's city limits. Scottsboro and Jackson County entered into a "mutual aid agreement," whereby Scottsboro agreed to provide emergency response services, including fire response services, to the Park and Marina.[4]

Scottsboro contends that it has no "enforcement authority" over Jackson County, nor can it independently inspect County property unless asked to do so by Jackson County. (*See* doc. 341, p. 10). According to Scottsboro's records, its then-City Fire Marshal, Charles Bryant, conducted at least two "courtesy inspections" of the Park and Marina— one in 2012 and the other in 2016. Bryant's inspections were for visual hazards. Bryant was looking for, among other things, "conspicuous portable fire extinguishers that had been serviced annually," "debris

---

[4] The parties have not produced the mutual aid agreement. The only available evidence relating to the agreement comes from witness testimony.

cluttering the dock that could potentially hinder evacuation or emergency response," and "breaker boxes that were not eroded and had doors that fully closed." (*Id.*, p. 12). Bryant did not verify that the Park and Marina complied with the NFPA, but he did provide Carl Barnes a copy of fire prevention guidelines for marinas. Bryant was not an electrician, nor did his inspections include detailed inspections of the Park and Marina's electrical systems. After the inspections, Bryant generated reports outlining any fire hazard concerns, and Bryant gave those reports to Park and Marina staff. Barnes testified that the Park and Marina was generally compliant and would accept the findings Bryant made in his inspection reports.

The parties dispute how often Scottsboro's fire marshal inspected the Park and Marina. While Scottsboro's records only show inspections in 2012 and 2016, Bryant testified that there was a "good chance" the City's Fire Marshal inspected the Park and Marina annually.

## H.    SEPB's Electrical Services for the Park and Marina

SEPB is a public corporation that provides electric, digital cable, and telephone services. It is the exclusive electric service provider in Scottsboro. Jackson County is one of SEPB's customers.

In March 2009, SEPB and Jackson County entered into an Industrial Power Contract, which was superseded by an Electric Service Agreement ("ESA") in 2016. The ESA "set forth the terms governing the delivery of power to the Park." (Doc. 342, p. 17). As relevant here, the ESA provides:

> WHEREAS SEPB currently provides electrical services to County Park located within the corporate city limits of the City of Scottsboro and the service currently terminates at the master electric meter just inside the County Park entrance from County Park Road; and
>
> WHEREAS [Jackson] County is current[ly] responsible for the primary and second electric service to all points of use

within the County Park beyond the master meter; and

WHEREAS the parties hereto believe that it would [be] mutually beneficial to both parties for SEPB to own and maintain all primary and secondary electric service lines and components up to the point of delivery for each individual user within County Park.

NOW THEREFORE, based upon mutual consideration and conditions contained herein, being valuable consideration for each party to this agreement, the parties hereby agree as follows:

1. SEPB shall provide electrical services to the County at the Jackson County Park.

2. SEPB will erect and maintain or continue to maintain a "master electric meter" for all electricity delivered to County Park, with the exception of any building located in the County Park which is separately metered by SEPB.

3. The County has declared the entire electric plant including the electrical wires, transformers, utility poles, security lights and other equipment or electric devices to be surplus and does hereby convey the same to the SEPB in consideration for SEPB providing maintenance to the electric system within the County Park. All such electric plant is conveyed to SEPB "AS IS" with no warranty or guarantee of any kind, implied or otherwise. SEPB shall have the right to continue to use so much of the electric plant as it determines to be safe and usable but may remove or discard any such plant that it determines is not safe or usable for service within the County Park.

4. SEPB shall be responsible for the electric plant within the County Park from the point where such service enters the County Park, through the master meter, terminating

14

> at the point of delivery for each building, campsite, cabin, boat slip, or other individual point of delivery, generally being a meter or other cut off.

(Doc. 329-4, pp. 69-70) (highlighting added). Read plainly, the "point of delivery" refers to the point where SEPB's responsibilities for the Park and Marina's electrical system ends and where Jackson County's begins. But the agreement does not define the "point of delivery," and the parties dispute where that point is. SEPB contends (and Jackson County agrees) that the "point of delivery" is where the "compression connectors attached to the weather heads" on the utility poles, as circled in this photo:



(Doc. 342, p. 20). Under SEPB's interpretation of the agreement, Jackson County became responsible for the electrical system, including its maintenance and service, below the circled "point of delivery" at the top of the utility poles. Under that "point of delivery," the electric lines ran down the pole to the breaker at the pole's base and then extended underground to feed the breakers on Dock B and the boat slips. Below is a breaker box showing the electric lines extending underground:

15



(Doc. 329-4, p. 74). SEPB's corporate representative, Phillip Haney, and Barnes confirmed that Jackson County and SEPB interpreted the "point of delivery" provision as referring to the connection point at the top of the Park and Marina's utility poles.

As part of its operations, SEPB operates a Supervisory Control and Data Acquisition ("SCADA") system to monitor its electrical grid for abnormal conditions, outages, or faults. SEPB's SCADA system did not detect any faults, interruptions, or other irregularities on the date of the fire. And SEPB did not receive any calls or reports relating to the Dock B fire or an electrical problem at the Jackson County Park and Marina the night of the fire.

## I.    The lawsuit: Claims and Procedural History

1. *Plaintiffs' claims against TVA:* Plaintiffs have three operative complaints, one in each case. (*See Paulk*, doc. 187; *Miles*, doc. 186; *Jones*, doc. 295). Plaintiffs originally brought five claims against TVA, two under Alabama state law (Counts 1-2) and three under general maritime law (Counts 3-5):

- **Count 1:** Negligence Under Alabama Law.
- **Count 2:** Wantonness Under Alabama Law.

16

- **Count 3:** Negligence Personal Injury Survival Action Under General Maritime Law.
- **Count 4:** Negligence Resulting in Personal Injury and Wrongful Death Under General Maritime Law.
- **Count 5:** Negligence Resulting in Property Damage Under General Maritime Law.

(*See* doc. 187, pp. 32-46). On January 6, 2025, the court dismissed Plaintiffs' state-law claims for the surviving Plaintiffs and dismissed Count 1 for the wrongful death Plaintiffs. The court allowed Plaintiffs to bring Count 2 for the wrongful death Plaintiffs but only "to the extent that Count 2 allows them to seek punitive damages." (*See* doc. 274, p. 24).

But all three maritime-based negligence claims persist. Plaintiffs offer two theories of negligence. TVA refers to theory one as the "fire causation" claim and theory two as the "fire mitigation" claim. Because the court finds these labels helpful, it adopts them in this opinion.

Plaintiffs' fire causation claim alleges that TVA was negligent by failing to inspect, maintain, and remedy Dock B's electrical system. Plaintiffs allege that Jackson County Park and Marina manager, Carl Barnes, "forced a 55-amp breaker into the slot in the breaker box which serviced the boat slip in which the *Dixie Delight* was berthed." (Doc. 187, p. 25). According to Plaintiffs' causation expert, John Frost, the *Dixie Delight* was designed "for a maximum of 30 amps of current." (Doc. 322-2, p. 24). So when Barnes installed the 55-amp circuit breaker into the *Dixie Delight's* circuit breaker slot, "the maximum current in the connector was almost doubled." (*Id.* at p. 27). This overflow of power, in Frost's opinion, caused the fire. Plaintiff Tommy Jones testified during his deposition that he witnessed Barnes install the 55-amp circuit breaker on May 21, 2019, which was 8 months and 6 days before the fire. (*See* doc. 336-13, pp. 260-261).

Plaintiffs' fire mitigation claim alleges that TVA was negligent by failing to install certain fire mitigation and safety measures that, Plaintiffs say, would have prevented or at least reduced the damages they

17

suffered because of the Dock B fire. These include things like: failing to adopt an emergency evacuation plan, permitting non-navigable boats (like the *Dixie Delight*) to moor at Dock B, failing to have a fire boat or safety skiff available at Dock B, and failing to require U.S. Coast Guard approved life preservers on Dock B.

2. *TVA's third-party claims*: TVA brings these third-party claims against Jackson County, Scottsboro, and SEPB:

- **Count 1:** Liability to Plaintiffs Under Federal Maritime Law and Federal Rules of Civil Procedure 9(h) and 14(c). TVA brings this claim against all third-party Defendants.
- **Count 2:** Contribution Under Federal Maritime Law. TVA also brings this claim against all third-party Defendants.
- **Count 3:** Indemnity. TVA brings this claim against Jackson County only.

(*See* doc. 193). TVA previously countersued Plaintiff Tim Parker, the owner of the *Dixie Delight*, but voluntarily dismissed that claim in February 2024. Both Scottsboro and SEPB bring fourth-party claims against Parker for contribution. (*See* docs. 239, 240).

## J.   Pending Motions

Thirteen motions are pending. TVA seeks summary judgment on Plaintiffs' three maritime negligence claims (doc. 314). Jackson County, Scottsboro, and SEPB seek summary judgment on TVA's third-party claims (docs. 320, 328, 330, 335). TVA and Jackson County move to exclude Plaintiffs' expert Michael Pratt. (docs. 316, 333). TVA moves to exclude Plaintiffs' expert Boris Datnow (doc. 318). TVA and the third-party Defendants move to exclude Plaintiffs' expert John Frost (docs. 321, 325). TVA also moves to strike affidavits from Pratt and Frost that Plaintiffs attached to their responses to TVA and Jackson County's motions for summary judgment (doc. 377). And Jackson County moves to join TVA's motions to exclude Boris Datnow and strike Pratt and Frost's affidavits (docs. 332, 403).

18

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record showing the absence of genuine issues of material fact. *Id.* at 323. The burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Id.* at 325.

When the moving party has carried its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323.

## DISCUSSION

Eight of the 12 pending motions involve attacks on Plaintiffs' experts. Because the court's ruling on some of the expert-related issues impacts the motions for summary judgment, the court starts by ruling on the expert-related motions.

## I.    Motions to Exclude

When considering the admissibility of expert testimony, this court acts as a "gatekeeper[] to ensure that speculative, unreliable testimony does not reach the [factfinder]." *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). But of course, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden

of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow. Pharm., Inc.*, 509 U.S. 579, 596 (1993). And that's especially true in bench trial cases like this one "when the gatekeeper is keeping the gate only for himself." *See United States v. Brown*, 415 F.3d 1257, 1268-69 (11th Cir. 2005); *see also In re Teltronics, Inc.*, 904 F.3d 1303, 1312 (11th Cir. 2018) ("Our review is even more relaxed in a bench trial situation, where the judge is serving as a factfinder and we are not concerned about dumping a barrage of questionable scientific evidence on a jury.") (internal quotations omitted). Three factors guide the court's expert admissibility inquiry:

> (1) the expert must be qualified to testify competently regarding the matters he intends to address;

> (2) the methodology by which the expert reaches his conclusions must be sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and

> (3) the testimony must assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*See Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850-51 (11th Cir. 2021). The proponent of expert testimony bears the burden of establishing these factors. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

### A.    John Frost

John Frost served as a practicing safety engineer for over 33 years with the Department of Defense. According to Frost's expert report, he has conducted investigations of accidents involving U.S. army personnel, including as the Safety Engineer for "an accidental ignition of the nuclear PERSHING missile." (Doc. 327-1, p. 7). In 1995, Frost was promoted to Chief of the MICOM Safety Office, where he was responsible for the safety of the Army's aircraft and missiles. (*See* doc. 327-9). After retiring from civil service, Frost was appointed to NASA's aerospace Safety Advisory

20

Panel, where he provided safety advice and oversight to NASA after the Apollo 1 fire at Cape Canaveral. Frost is a member of the NFPA and the International System Safety Society.

At trial, Frost plans to testify, among other things, that (1) the Dock B fire was caused by the presence of an oversized 55-amp circuit breaker in the breaker box which serviced the boat slip in which the *Dixie Delight* was berthed and (2) a reasonable inspection program would have detected unsafe conditions on Dock B, including the oversized breaker, thereby preventing the fire. (*See* doc. 327-1, pp. 28-32). TVA seeks only to exclude Frost's "reasonable inspection" opinion. The third-party Defendants, on the other hand, seek to exclude Frost's oversized breaker opinion. Because the oversized breaker opinion is the lynchpin of Frost's testimony (and Plaintiffs' entire fire causation claim), the court starts with it.

The third-party Defendants offer three reasons why Frost's fire causation opinion should be excluded: (1) Frost is unqualified to give the opinion, (2) Frost's opinion is based on insufficient facts and data, and (3) Frost's methodology is unrecognized and unreliable.

1. <u>Frost's Qualifications</u>. The third-party Defendants concede that Frost "possesses impressive credentials in the field of safety engineering," but nonetheless contend that he lacks the requisite credentials "necessary to provide an opinion on the cause and origin of the Dock B fire." (Doc. 325, p. 6-7). The court disagrees.

"A witness is qualified as an expert if he is the type of person who should be testifying on the matter at hand." *Moore*, 995 F.3d at 852. Frost has years of experience as a safety engineer. He served as the lead electrical and safety engineer for the largest fire investigation conducted by the United States Army. (*See* doc. 327-12, p. 9). He's a member of the NFPA, which creates regulations and standards to prevent fire and electrical hazards. And Frost has offered fire causation testimony in other cases. *See Hilliard v. Huntsville Elec. Util. Bd.*, 599 So. 2d 1108, 1112 (Ala. 1992) (relying on Frost's expert opinion that an apartment fire was caused by a utility board's failure to disconnect an "old 200-amp service circuit

breaker to a hot water heater"); *see also Walter v. Altec Indus.*, 2003 U.S. Dist. LEXIS 27631, \*4 (M.D. Fla. Sept. 3, 2003) (finding Frost qualified to offer an expert opinion on electrocution causation). So the third-party Defendants' contention that Frost lacks "knowledge or experience with respect to fire cause and origin investigations" is wrong.

While it's true that Frost hasn't investigated boat fires or fires in the marine context generally, those "gaps" in his qualifications go to the weight of his testimony—not its admissibility. *See Banuchi v. City of Homestead*, 606 F. Supp. 3d 1262, 1270 (S.D. Fla. 2022). And that principle is even more forceful here because Frost is not offering an opinion on an issue unique to the marine context. Instead, he's simply opining that an oversized circuit breaker resulted in an overflow of electricity. As Frost stated in his deposition "an overheated electrical circuit is the same, regardless of where it is." (Doc. 327-12, p. 9).

The court finds at this stage that Frost is "the type of person who should be testifying" about whether an oversized circuit breaker caused the Dock B fire. *See Moore*, 995 F.3d at 852. So the court will not exclude his fire causation testimony based on his qualifications.

2. <u>Frost's Facts and Data</u>. The third-party Defendants next argue that Frost's fire causation opinion should be excluded because it relies on "fictitious facts." (Doc. 325, p. 17). Specifically, they contend that Frost's opinion rests on the faulty assumption that, on the night of the fire, the *Dixie Delight* was moored in "Slip 36-B," where the oversized, 55-amp circuit breaker connected, when in fact it was moored in "Slip 36," where two properly sized, 30-amp circuit breakers were connected.

The third-party Defendants are of course correct that, if undisputed, this fact would undermine Frost's fire causation opinion because an oversized circuit breaker can't cause a slipped boat to catch fire unless it's connected to that boat slip's electrical system. But the location of the *Dixie Delight* at the time of the fire *is* disputed. For one thing, Carl Barnes couldn't say for certain whether the 55-amp breaker serviced the *Dixie Delight* because the slip labels inside the circuit breaker panel were

written incorrectly. (*See* doc. 327-5, p. 41). And Andrew Utech, the brother of former *Dixie Delight* owner Alex Utech, says in his affidavit that the 55-amp breaker slot "protected *Dixie Delight*" when his brother owned it. (Doc. 364-6, p. 5). Finally, Plaintiff Tommy Jones says in his affidavit that he helped the Utech brothers move the *Dixie Delight* "into the slip it was in at the time of the fire," and that same slip was connected to the 55-amp breaker slot.

So there is a genuine dispute of material fact whether the *Dixie Delight* was connected to the oversized breaker when the fire started. Frost bases his fire causation opinion on a set of facts where the *Dixie Delight* was connected to the 55-amp circuit breaker in the "Slip 36-B" slot. That set of facts may turn out to be wrong. But the court must assume at the Rule 56 stage that his factual assumption is correct and make the final call at trial.

3. <u>Frost's Methodology</u>. The third-party Defendants' final argument for excluding Frost is that he relies "upon an unsupported and clearly deficient methodology[.]" (Doc. 325, p. 23). The third-party Defendants' chief criticism of Frost's methodology is that he failed to guide his analysis with NFPA 921's *Guide for Fire and Explosion Investigations* and instead relied on OSHA guidelines. The third-party Defendants also list several facts and issues they say Frost ignored or presumed when conducting his analysis.

For starters, the court finds that Frost's opinions aren't doomed because he used OSHA guidelines instead of NFPA 921. As Plaintiffs point out, federal courts across the country have noted that "NFPA is not the be all and end-all" in fire investigation analysis. *See, e.g.*, *Kechi Twp. v. Freightliner, LLC*, 592 F. App'x 657, 671 (10th Cir. 2014). And, in any event, the OSHA guidelines provide a general framework similar to NFPA 921. If the OSHA guidelines have shortcomings compared to NFPA 921, Defendants can point them out at trial to attack the weight of Frost's testimony. But the difference fails to exclude Frost's testimony.

23

The court finds the rest of the third-party Defendants' arguments better suited for resolution at trial rather than the Rule 56 stage. Frost has provided, through his report and deposition, enough analysis to support his fire causation opinion. The court can—and will—make findings on the admissibility of Frost's opinions and his credibility after the court has had the opportunity to question him at trial. But until then, the court will not exclude Frost's fire causation opinion.

———

For the reasons above, the court will **deny without prejudice** the third-party Defendants' motion to exclude John Frost (doc. 325). Because Frost's "reasonable inspection" opinion is not implicated at the Rule 56 stage, the court will also **deny** TVA's motion to exclude Frost **without prejudice** (doc. 321). All arguments on the admissibility and credibility of Frost's opinions are preserved for trial.

### B.   Michael Pratt

Michael Pratt is a professional engineer and a certified fire and explosion investigator. According to Pratt's CV, he has over 34 years of experience in mechanical and forensic engineering and has conducted more than 2,900 incident investigations, ranging from small pipe ruptures to industrial plant explosions. Pratt has, in past cases, offered expert opinions on fire protection and suppression systems at docks and marinas. He is also a member of the National Association of Fire Investigators, the NFPA, and the Society of Fire Protection Engineers.

Pratt plans to offer three opinions at trial: (1) Dock B lacked effective fire protection, (2) TVA failed to follow industry-accepted, best practices for fire protection at the Park and Marina, and (3) the National Transportation Safety Board correctly concluded in its accident investigation report that the Park and Marina's limited fire safety practices contributed to the severity of the Dock B fire and the loss of life. (*See* doc. 317-2, p. 7). TVA and Jackson County seek to exclude Pratt's opinions in their entirety. While TVA and Jackson County's arguments

24

differ slightly, they can be categorized as follows: (a) Pratt's opinions are based on an unreliable methodology and (b) Pratt's opinions are unhelpful legal conclusions. TVA and Jackson County also advance arguments about things like Pratt's use of an NTSB accident report and TVA's Clean Marina guidebook.

1. <u>Pratt's Methodology</u>. To start, both Jackson County and TVA argue that Pratt failed to employ a reliable methodology when he concluded that Dock B lacked industry-accepted fire and safety measures. Specifically, they contend that Pratt's opinions are conclusory and fail to apply a scientifically recognized methodology. Both parties also criticize, among other things, Pratt's reliance on National Water Safety Congress Guidelines and his failure to inspect other docks and marinas on Lake Guntersville.

Jackson County and TVA's broad argument about Pratt's lack of methodology fails because Pratt reached his opinions through his experience as a fire investigator and his knowledge of industry practices related to fire and safety measures. In Pratt's report, he explains what industry guidelines he reviewed, what those guidelines say, and how Dock B's fire and safety measures (or lack thereof) failed to comply with those guidelines. And when pressed during his deposition about his use of those guidelines, Pratt explained his familiarity with them through his training and experience investigating incidents at docks and marina. (*See* doc. 317-1, p. 14). So there is a sufficient foundation for Pratt's testimony.

Jackson County and TVA's remaining arguments about Pratt's methodology are best suited for cross-examination and are improper at this stage. For example, Pratt's failure to personally inspect neighboring docks around Lake Guntersville isn't an issue that disqualifies him from testifying about Dock B's lack of fire and safety measures. It may harm his credibility, but the court will make that determination later. For now, the court will not exclude Pratt because of his methodology.

2. <u>Pratt's Conclusions</u>. Next, Jackson County and TVA argue that Pratt's opinions should be excluded because they amount to unhelpful

legal conclusions. Jackson County challenges Pratt's opinion that the absence of fire and safety measures on Dock B worsened Plaintiffs' injuries. TVA, meanwhile, attacks Pratt's opinions that Dock B lacked fire and safety measures consistent with industry accepted "best practices" and his reliance on the NTSB's accident report.

Jackson County and TVA's arguments are misplaced. Pratt's opinions, informed by his experience and training, merely explain how Dock B's fire and safety measures deviated from industry standards. While his opinions may "embrace[] an ultimate issue to be decided by the trier of fact," this court can prevent Pratt from crossing the line from industry-based opinions to legal conclusions at trial. *See Cook ex rel. Est. of Tessier, v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) (quoting Fed. R. Evid. 704(a)); *see also Decamp v. State Farm Fire & Cas. Co.*, 558 F. Supp. 3d 1196, 1202 (M.D. Fla. 2021) (refusing to exclude an industry expert because "legal conclusion" testimony can be prevented at trial).

The rest of Jackson County and TVA's arguments, including their arguments about Pratt's use of the NTSB accident report and TVA's Clean Marina guidebook, are better suited for pre-trial motions in limine or trial-day objections. So the court will **deny without prejudice** Jackson County and TVA's motions to exclude Michael Pratt (docs. 316, 333). As with Frost, all arguments on the admissibility and credibility of Pratt's opinions are preserved for trial.

### C.    Dr. Boris Datnow

Plaintiffs retained Dr. Boris Datnow to provide an expert opinion as to "whether David Miller's exposure to heat and smoke" during the Dock B fire "exacerbated his pre-existing condition of Chronic Obstructive Pulmonary Disease and hastened his death as a result." (*See* doc. 319-1, p. 1). Dr. Datnow is a certified pathologist. He reviewed, among other things, Miller's medical records and death certificate. Dr. Datnow says that he performed a differential diagnosis, ruled out other causes of Miller's death, and plans to testify that Miller's exposure to the Dock B

26

fire hastened his death.

The court has reviewed TVA's motion to exclude Dr. Datnow. Because Dr. Datnow's opinions and planned testimony are not implicated in the pending motions for summary judgment, the court will **deny** TVA's motion to exclude Dr. Datnow **without prejudice**. TVA's arguments are preserved and may be re-raised before trial. Given this ruling, the court will **deny as moot** Jackson County's motion for joinder (doc. 332).

———

To sum up, the court (1) **denies without prejudice** TVA and the third-party Defendants' motions to exclude John Frost (docs. 321, 325); (2) **denies without prejudice** TVA and Jackson County's motion to exclude Michael Pratt (docs. 316, 333); and (3) **denies without prejudice** TVA's motion to exclude Dr. Boris Datnow (doc. 318). Because the court did not rely on the affidavits submitted in support of Frost and Pratt, the court **denies** TVA's motion to strike (doc. 377) **as moot**. Further, the court **denies** Jackson County's motions for joinder (docs. 332, 403) **as moot**. All arguments regarding the credibility of these experts and the admissibility of their opinions are preserved for trial.

## II.   TVA's Motion for Summary Judgment

TVA moves for summary judgment on Plaintiffs' fire causation claim and fire mitigation claim. The court discusses each claim, and TVA's arguments, in turn.

### A.   Fire Causation Claim

As discussed above, Plaintiffs' fire causation claim alleges that TVA was negligent by failing to inspect, maintain, and remedy Dock B's electrical system. Specifically, Plaintiffs contend that TVA was negligent by failing to identify and remove the oversized 55-amp circuit breaker that Carl Barnes allegedly installed in the breaker box which serviced the *Dixie Delight*'s boat slip.

While TVA briefly argues that it did not assume a generalized duty of care with respect to Dock B and Plaintiffs, its focal argument is that, even if it did assume a duty of care, it did not have "actual or constructive knowledge that an oversized breaker had been installed in the pertinent Dock B breaker box" that serviced the *Dixie Delight*. (*See* doc. 337, p. 22).

1. <u>Duty of Care</u>. To begin, the court finds that TVA did owe at least a generalized duty of reasonable care to Plaintiffs because, even though TVA did not own Dock B, TVA exercised sufficient control over it. *See Kesslering v. Chesapeake & O. Ry. Co.*, 437 F. Supp. 267, 269 (E.D. Mich. 1977) ("Control over the easement and not ownership of the property determines who is liable for injuries resulting from a failure to maintain and repair the easement."); *see also Tisdale v. United States*, 62 F.3d 1367, 1371 (11th Cir. 1995) ("Custody and control are the commonly accepted and generally understood incidents of possession."); *see also Newcomb v. Spring Creek Cooler Inc.*, 926 F.3d 709, 714 (11th Cir. 2019) (applying Georgia law and explaining that a duty regarding a premises' condition "is imposed because the landowner has control over the property and is thus able to act in order to protect others from conditions on the property which might cause harm"). Indeed, Plaintiffs submitted enough evidence to allow a reasonable factfinder to decide that TVA not only owned the easement property where Dock B is located, but it exercised control over the Park and Marina through its property rights, regulatory authority, and various initiatives.

TVA hardly resists this conclusion. Instead, it argues that, since Jackson County owes a duty of reasonable care with respect to Dock B as the Dock's "wharfinger," TVA's duty can be no higher. The court agrees with that contention, so it will analyze TVA's actual or constructive knowledge argument through a duty of reasonable care lens.

2. <u>Actual or Constructive Knowledge</u>. Under maritime law, TVA can only be held liable for Plaintiffs' fire causation claim if it had "actual or constructive knowledge" of the oversized breaker on Dock B. *See Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) ("[T]he

28

benchmark against which [the maritime defendant's] behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the [defendant] have had actual or constructive knowledge of the risk-creating condition[.]"). Actual notice "exists when the defendant knows about the dangerous condition." *Holland v. Carnival Corp.*, 50 F.4th 1088, 1095 (11th Cir. 2022). Plaintiffs offer no evidence (or even an allegation) that TVA *actually* knew that an oversized breaker was installed at Dock B.

So the only way Plaintiffs can prove TVA caused the fire is to prove TVA had "constructive knowledge" of the oversized breaker. Constructive knowledge can be established in two ways. First "a plaintiff can show evidence of substantially similar incidents" caused by the dangerous condition before the incident giving rise to the plaintiff's injury. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178–79 (11th Cir. 2020). Second, a plaintiff can show "that a defective condition existed for a sufficient period of time to invite corrective measures." *Id.* at 1178. A defective condition "must be reasonably detectable for it to invite corrective measures." *Id.* at 1179.

Plaintiffs don't allege that similar incidents involving Dock B's electrical system happened before the *Dixie Delight* caught fire, so TVA didn't have constructive notice based on similar incidents. But whether the oversized breaker "existed for a sufficient period of time to invite corrective measures" is a more difficult issue. Plaintiff Tommy Jones Jr. says he witnessed Barnes install the oversized breaker on May 21, 2019— eight months and six days before the fire. (*See* doc. 336-13, pp. 260-61). Jones captured the picture below after he watched Barnes install the 55-amp breaker:

29



(Doc. 322-2, p. 18) (circle added by the parties).

Unsurprisingly, most general maritime cases analyzing constructive notice of a defective condition deal with slip-and-falls on boats or similar issues. *See, e.g.*, *Malley v. Royal Caribbean Cruises, Ltd.*, 713 F. App'x 905 (11th Cir. 2017); *Keefe*, 867 F.2d 1318 (11th Cir. 1989). In those cases, the Eleventh Circuit has generally concluded that "a genuine issue of material fact exists as to whether a [defendant had constructive notice] when the unsafe condition existed for between fifteen and twenty minutes" and the defendant conducted inspections or regularly visited the area where the unsafe condition existed. *See Lebron v. Royal Caribbean Cruises Ltd.*, 818 F. App'x 918, 921-22 (11th Cir. 2020) (citing *D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 798 (11th Cir. 2019)). For example, in *Lebron*, the Eleventh Circuit concluded that a maritime defendant had constructive notice of "gouges" in an ice rink where (1) the gouges had existed for 10-15 minutes before the plaintiff fell, (2) the defendant's employees were charged with watching the ice, and (3) the defendant's employees were "aware that poorly maintained ice can result in accident and injury." 818 F. App'x at 921-22.

Each of *Lebron's* three constructive notice indicia are evident in this case. First, the oversized breaker existed for eight months and six days—considerably more time than the ten to fifteen minutes the ice gouges were present in *Lebron*. Second, the record shows that TVA employees would inspect the Park and Marina, including its electrical systems, under the CMI and CCI. While the oversized breaker wasn't as open and obvious as gouges on an ice rink, a simple inspection of Dock B's circuit breaker panel by someone with knowledge of Dock B's electrical system would have likely revealed the labeled oversized breaker. And third, TVA was aware that electrical defects on its property could result in injury, as it required the Park and Marina to comply with electrical codes and regulations and even compelled Jackson County to hire certified electricians to inspect the Park and Marina's electrical systems after TVA identified "electrical safety issues" at one of its other properties. (*See* doc. 187-7, p. 2).

TVA disputes that it had a duty to inspect Dock B's electrical system in the months between Barnes' installation of the oversized breaker and the fire. But TVA offers no legal basis for why this duty should not attach when TVA controlled the Park and Marina, required Jackson County to abide by electrical codes and regulations, and inspected the Park and Marina's electrical systems. To rule for TVA, the court would have to fashion a rule that TVA had a duty of reasonable care as the entity who controlled the Park and Marina but carve the Park and Marina's electrical system out of that duty. TVA cites no case, binding or otherwise, to support such a carve-out.

Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable factfinder could conclude that TVA owed Plaintiffs a duty of reasonable care and that TVA had constructive notice of the oversized breaker. As a result, the court will **deny** TVA's motion for summary judgment on Plaintiffs' fire causation claim.

## B.   Fire Mitigation Claim

Plaintiffs' fire mitigation claims allege that TVA was negligent by failing to require or implement certain fire mitigation and safety

31

measures that would have, at the least, reduced the severity of the fire and Plaintiffs' injuries. Plaintiffs say these acts and omissions, among others, are evidence that TVA breached its duty of care:

- TVA did not require Dock B's roof to have fire and smoke vents, burn-through panels, and gravity-operated drop out vents.
- TVA did not implement a written marina fire emergency response plan or require regular fire drills.
- TVA did not require fire protection equipment or suppression systems—like fire extinguishers—to be adequately maintained and placed along Dock B.
- TVA failed to require a safety skiff at Dock B to tow the *Dixie Delight* away to open water once the fire started.
- TVA allowed non-navigable boats and gas grills on Dock B.
- TVA did not require accessible U.S. Coast Guard approved flotation devices on Dock B.

(*See* doc. 187, pp. 26-30).

Unlike Plaintiffs' fire causation claim, TVA admits it had actual or constructive notice of Dock B's lack of fire mitigation and safety measures. So instead, TVA argues that it had no maritime tort duty to implement the measures. TVA focuses its motion on three of its roles in relation to the Park and Marina and contends that none of those roles imposed a duty to require the fire mitigation and safety measures. Those roles include: (1) as agent of the underlying landowner, (2) as a federal regulator under § 26a, and (3) as the administrator of the CMI.

TVA may be correct that, standing alone, none of these roles created a duty to implement more fire and safety measures on Dock B. But the record shows that TVA took an active role in controlling the Park and Marina through its property rights, regulatory authority, and various initiatives. As discussed, the duty to prevent damages from a property's hazardous conditions often springs from control over a property. *See*

*Kesslering*, 437 F. Supp. at 269 ("Control over the easement and not ownership of the property determines who is liable for injuries resulting from a failure to maintain and repair the easement."); *Newcomb*, 926 F.3d at 714 (11th Cir. 2019) (applying Georgia law and explaining that a duty regarding a premises' condition "is imposed because the landowner has control over the property and is thus able to act in order to protect others from conditions on the property which might cause harm").

Jackson County employees repeatedly testified about the control TVA exercised over the Park and Marina through the 1963 Indenture and TVA's § 26a authority. For example, former Park and Marina manager Carl Marona testified that TVA dictated its rules and standards to Jackson County:

> Q. […] If the TVA told you, as the park manager for Jackson County, that y'all needed to do something out there at the park to meet the TVA standards, would you agree that that was a requirement you had to meet? In other words, you couldn't tell the TVA no. You had to do what they told you to do?
>
> A. Well, yes sir.
>
> Q. Okay. That's what [Carl] Barnes told us yesterday as well, and I just wanted to make sure that when you were the park manager, that when the TVA asked y'all to do things a certain way, that y'all were required to do what the TVA asked of you.
>
> A. Yeah.

(Doc. 323-10, p. 8). TVA illustrated its control over the Park and Marina in 2008 when it learned that Jackson County was permitting campers to violate TVA rules about length of stay and placement of campsites. TVA informed Marona that it would not allow campers to remain on the property for more than 21 days consecutively and that certain campsites had to be moved above the 600' contour line to comply with TVA safety

standards. After the meeting, TVA officials recapped the discussion via internal emails and said that "[w]e reminded [Jackson County] of the terms of both their easement below the 600 elevation and the transfer deed, including the right of re-entry." (Doc. 336-5, p. 2-3). One TVA official noted to his colleagues, "[i]f we provide clear guidance and apply moderate but consistent pressure on [Jackson County], I believe we can make real progress." (*Id.*).

More importantly, TVA took an active role in monitoring the Park and Marina's electrical systems and safety measures. For example, TVA used the CCI and CMI to inspect the Park and Marina, including its docks, and ensure that safety standards were met. And when TVA uncovered "electrical safety hazards" at a different marina, it required Jackson County to provide documentation from a certified electrician to prove that the Park and Marina's electrical systems complied with the NEC. Barnes also testified that Jackson County "rel[ied] on TVA to tell [Jackson County] what fire protection was needed on Dock B." (*See* doc. 322-5, p. 99). According to Barnes, TVA had the final say on what fire protection Dock B used. (*See id.*).

TVA argues in its reply brief that "'[c]ontrol is not a magic talisman that justifies imposing landowner liability based on the facts present[.]" (Doc. 395, p. 16). To support its argument, TVA cites *Ala. Power Co. v. Dunaway*, 502 So. 2d 726 (Ala. 1987). In that case, a child drowned at an Alabama Power-owned reservoir on Lake Martin while camping at a marina Alabama Power had leased to a private owner. The child's father sued Alabama Power for wrongful death and claimed that it was negligent by failing to require lifeguards or guardrails near the seawall. The Alabama Supreme Court reversed a jury verdict against Alabama Power, finding "no basis for liability[.]" *Id.* at 731. At first blush, *Dunaway* appears to support TVA's argument. But TVA ignores a crucial part of the case: the court applied Alabama law on landlord liability. Under Alabama law, a landlord can only be held liable "for injuries resulting from latent defects, known to him at the time of the leasing, and which he concealed from the tenant." *Id.* at 728 (citing *Southern Apts., Inc. v. Emmett*, 114

34

So.2d 453 (1959)). But TVA does not lease the Park and Marina to Jackson County; the alleged fire mitigation measures weren't "latent defects"; and Plaintiffs' remaining negligence claims are not pleaded under Alabama law. So *Dunaway* is not implicated here.

At bottom, the record shows that TVA took an active role in controlling the Park and Marina. And when TVA instructed Jackson County on how to operate or maintain the Park and Marina, Jackson County always complied. Given the level of control TVA exercised over the Park and Marina, a reasonable factfinder could determine that TVA owed Plaintiffs a duty to exercise reasonable care with respect to Dock B.

With TVA's duty of care established, the court will leave whether TVA's failure to require additional fire mitigation and safety measures breached the standard of care for trial. Plaintiffs, through witness testimony and their expert, Michael Pratt, plan to offer argument that the fire mitigation and safety measures on Dock B deviated from industry-standard practices. Those arguments are appropriately left for the factfinder to consider. *See Fireman's Fund Am. Ins. v. Captain Fowler's Marina, Inc.*, 343 F. Supp. 347 (D. Mass. 1971) (considering evidence that a marina violated industry standards for marinas and boatyards by failing to take precautions against a nighttime fire); *Giorgio v. Holland Am. Line, Inc.*, 2006 WL 1042003, at *2 (W.D. Wash. Apr. 4, 2006) ("Regulations that are not binding by force of law, and therefore do not establish negligence per se, may nonetheless be admitted for the purpose of aiding the finder of fact in determining the applicable standard of care.").

———

For the reasons above, the court **denies** TVA's motion for summary judgment (doc. 314). Plaintiffs' fire causation and fire mitigations claims will proceed to trial.

## III.  Jackson County's Motion for Summary Judgment

Jackson County moves for summary judgment on TVA's third-party claims. Because TVA brings two claims for contribution and direct

liability, part of Jackson County's motion is directed at Plaintiffs' fire causation claims, fire mitigation claims, and wantonness claims. Jackson County directs the rest of its motion at TVA's indemnification claim.

### A.    Fire Causation Claim

Unlike TVA, Jackson County admits for purposes of summary judgment that it owed Plaintiffs a duty of reasonable care. So rather than contesting its duty, Jackson County argues it did not (1) breach a duty that caused the Dock B fire or (2) have notice that the Dock B circuit breaker panel posed a fire hazard. Both arguments fail.

1. <u>Jackson County's Breach</u>. Jackson County offers two reasons why it didn't breach a duty that caused the Dock B fire. First, it argues that the *Dixie Delight* wasn't moored in Slip 36-B at the time of the fire, so it couldn't have been connected to the oversized breaker. Second, Jackson County contends that, even if the *Dixie Delight* was moored in Slip 36-B, the oversized breaker could not have caused the fire.

To start, the court already concluded there is a genuine dispute of material fact about whether the *Dixie Delight's* electrical system was connected to the oversized breaker on the night of the fire. (*See* supra part I.A.2). So Jackson County is not entitled to summary judgment based on its argument that the *Dixie Delight* was not connected to the oversized breaker.

That leaves Jackson County's alternative argument that the oversized breaker could not have caused the fire. To support its argument, Jackson County relies on its experts KR Davis and Martin Gee. According to Davis, it's impossible that the *Dixie Delight's* dockside power caused the fire because, among other reasons, (1) Tim Parker's observations of the fire pattern don't match with a shore power connection fire and (2) the *Dixie Delight* was not drawing enough power on the night of the fire to cause overheating due to an oversized breaker. (*See* doc. 327-10, pp. 10-16). And according to Gee, the *Dixie Delight* came equipped with shore inlet breakers, which should have prevented the boat from drawing more

power than its electrical system was designed to handle even if an oversized breaker was installed in the shore power system. (*See* doc. 334-7, p. 41).

The court doesn't doubt the veracity of Davis and Gee's work or their opinions. But their opinions are exactly that—opinions. And they directly conflict with John Frost's opinion. So for this court to grant Jackson County's motion, it would have to weigh the credibility of the competing experts. That is something the court cannot do. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.") (internal quotations omitted); *see also Arthur v. Thomas*, 974 F. Supp. 2d 1340, 1352 (M.D. Ala. 2013) ("A court must refrain from such prohibited fact-finding at the summary judgment stage even in instances where it may serve as the ultimate factfinder at trial.").

Because the court cannot take the moving party's side on credibility questions at the Rule 56 stage, the court will deny Jackson County's motion for summary judgment based on its experts' opinions.

2. Jackson County's Notice. Jackson County separately argues that, even if the oversized breaker caused the *Dixie Delight* to catch fire, it did not have "actual or constructive notice of the risk-creating condition." (Doc. 347, p. 57).

Jackson County's argument fails from the outset because (assuming Plaintiffs' set of facts are true) the County's own employee, Carl Barnes, created the risk-creating condition when he installed the oversized breaker. *See Yusko v. NCL (Bahamas), Ltd.*, 4 F.4th 1164, 1170 (11th Cir. 2021) (holding that "a passenger need not establish that a shipowner had actual or constructive notice of a risk-creating condition to hold a shipowner liable for the negligent acts of its employees."). But even if that weren't true, Jackson County's argument fails because it *had* notice of the oversized breaker. The oversized breaker was in place for over eight months before the fire and was clearly labeled. Carl Barnes knew or

should have known about the oversized breaker because he worked on Dock B's electrical system. Each time Barnes inspected Dock B and its electrical system, the oversized breaker would have been fully visible. Try as it might, Jackson County cannot separate its knowledge from that of its Park and Marina manager. So Jackson County's lack of notice argument also fails.

––––

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable factfinder could conclude that Jackson County had notice of the oversized breaker and that the oversized breaker caused the Dock B fire. As a result, the court must **deny** Jackson County's motion for summary judgment on Plaintiffs' fire causation claim.

## B.    Fire Mitigation Claim

Jackson County next seeks summary judgment on Plaintiffs' fire mitigation claim. Again, Jackson County recognizes that it owed Plaintiffs a duty of reasonable care. So rather than contest its duty, Jackson County argues that (1) Dock B complied with relevant industry-standard safety practices, (2) Dock B's alleged lack of fire mitigation and safety measures did not cause or contribute to Plaintiffs' injuries, and (3) the absence of better fire mitigation and safety measures was "open and obvious."

For the reasons already discussed (*see* supra part II.B), the court will leave whether Dock B's lack of additional fire mitigation and safety measures breached the standard of care for trial. Likewise, the court will leave the issues of whether Dock B complied with relevant industry-standard safety practices and whether the lack of other measures caused Plaintiffs' injuries for trial because the evidence conflicts. As pointed out by Plaintiffs and their expert, Michael Pratt, Dock B lacked certain safety measures that, if used, may have mitigated or prevented Plaintiffs' injuries. Chief among these measures include an emergency response plan, a rescue boat or safety skiff, and additional fire suppression systems. And the court cannot say at this point whether these measures, if adopted,

38

would have prevented or mitigated Plaintiffs' injuries. *See Rodgers v. AWB Indus., Inc.*, 762 F. App'x 1015, 1025 (11th Cir. 2019) (quoting Alabama law that "the question of proximate cause is almost always a question of fact to be determined by the [factfinder].").

Jackson County's last argument that Dock B's lack of fire mitigation and safety measures was "open and obvious" fails because "[t]he open and obvious nature of a dangerous condition" negates liability for failure to warn claims—not negligent maintenance and operation claims. *See Carroll v. Carnival Corp.*, 955 F.3d 1260, 1269 (11th Cir. 2020).[5] Here, Plaintiffs do not claim that Jackson County failed to warn them about Dock B's lack of fire mitigation and safety measures; they contend that Jackson County negligently maintained and operated Dock B. So Jackson County's "open and obvious" argument fails as a matter of law.

### C.    Plaintiffs' Wantonness Claim

Jackson County separately argues that, even if it was negligent, Plaintiffs are not entitled to punitive damages because there is no evidence Jackson County acted with "wanton disregard for the damages that would likely result" from its failure to adequately maintain and operate Dock B. (Doc. 347, p. 78).

The parties disagree on the proper standard for awarding punitive damages under general maritime law. Jackson County contends that the standard from *In re Amtrak Sunset Ltd. Train Crash in Bayou Canot, Ala. on Sept. 22, 1993*, 121 F.3d 1421 (11th Cir. 1997) applies. Under that case, punitive damages are available only when a maritime plaintiff shows the defendant acted intentionally. *Id.* at 1428. Plaintiffs contend that *In re Amtrak*'s standard was abrogated by the Supreme Court in *Atl. Sounding v. Townsend*, 557 U.S. 404 (2009). In *Towsend*, the Supreme Court held that a seaman could, under general maritime law, get punitive damages

---

[5] *Caroll* adopted the Third Restatement of Tort's approach on this issue. 955 F.3d at 1268. According to the Restatement, the "open and obvious" nature of a dangerous condition doesn't negate liability for negligent maintenance and operation claims, but it may factor into a comparative fault analysis. *See id.*

for his employer's willful or wanton disregard of its maintenance and cure obligations. *Id.* at 424. But the Court's rationale underlying its holding was broad and "seemed to recognize that punitive damages that were available at common law for wanton, willful, or outrageous conduct traditionally have been extended to claims arising under federal maritime law." *Bass v. M/V STAR ISFJORD*, 644 F. Supp. 3d 1001, 1005 (S.D. Ala. 2022). Since *Townsend*, courts in the Eleventh Circuit have diverged in their views of whether *In re Amtrak's* punitive damages standard remains good law. *Compare Kennedy v. Carnival Corp.*, 385 F. Supp. 3d 1302, 1329 (S.D. Fla. 2019) *with Bass*, 644 F. Supp. 3d at 1008.

Recognizing that the same evidence offered to prove negligence will also be cited to prove or disprove wantonness, and that this is a bench trial, the court declines to decide the precise contours of the wantonness standard post-*Townsend*. This allows the parties to brief the issue more thoroughly after trial, focused on the evidence presented at trial. So the court **denies without prejudice** Jackson County's motion for summary judgment on Plaintiffs' claim for punitive damages.

## D.    TVA's Indemnification Claim

Finally, Jackson County asks the court to dismiss Count III, which is TVA's indemnification claim. The court **DENIES** this motion without reaching a conclusion as allowed by Rule 52(a)(3) because the indemnity issue is (a) premature, as the court has yet to find and allocate liability, and (b) the court knows there are yet-to-be made arguments that impact the viability and enforceability of the purported indemnity agreement, not to mention the collectability of any award against the County. This means that the County may re-raise the arguments it made against indemnity at the Rule 56 stage if (a) the court finds the parties jointly liable, (b) TVA pays (at least) its portion of a joint and  several liability judgment, and (c) TVA seeks indemnity under the 1963 Indenture.

While the court will not decide the indemnity issue before finding and apportioning liability (if any), the court knows that Paragraph 6 of the 1963 Indenture between TVA and Jackson County has been the most

contentious issue to date. So the court explains how it reads Paragraph 6, and how the parties read it wrongly, to help the parties understand what lies ahead should indemnity become an issue.

### 1. *An analogy*

Here is Paragraph 6 in its entirety:

> 6. As part of the consideration for this indenture, Grantee [Jackson County] releases Grantor [TVA], its successors, assigns, agents, instrumentalities, and employees of and from, and agrees that they shall not incur, any liability for injury to or death to any person or persons or for any damage to or loss of property resulting from or in any way connected with Grantor's [Jackson County's] application of larvicides, herbicides, or chemicals in dust, sprays, or aerosols or other forms on the fee parcel or easement area; as a result of the exercise or enforcement of flooding or reservoir fluctuation rights herein reserved; as a result of any erosion or saturation of banks or other lands which may accompany or follow such flooding or fluctuation or result from wave action, the percolation or seepage of ground water, or other causes; or as a result of the exercise or enforcement of any of the other rights or interests reserved, excepted or otherwise retained under this indenture, except liability for personal injuries, property damage or loss of life or property caused by the sole negligence of the Grantor.

(Doc. 336-1, p. 9). The court has twice held that the best reading of this paragraph is that it contains both (a) a release of Jackson County's claims against TVA, and (b) an agreement that Jackson County will indemnify TVA if TVA has to pay a judgment stemming from the parties' shared fault for injuring a third party or his property. The court gives an analogy that explains why the court believes that the plainest reading of

Paragraph 6 is an agreement to release and indemnify. Assume there are two friends, Jack and Tim, who make this agreement:

> In exchange for Tim driving Jack to Birmingham to eat at Perry's Steakhouse, Jack agrees to release Tim from any cost of the meal and agrees that Tim will not incur any cost from the meal unless Tim eats all of the food.

Tim drives Jack to Perry's, and the friends order appetizers and meals that cost $200 total. The friends share the appetizer and eat their chosen dish. When they finish, the waiter arrives with a bill for $200. Who pays?

Everyone should agree that, because Tim drove and did not eat all of the food, one of two things happens: either (a) Jack pays the restaurant $200 and does not seek reimbursement from Tim because Jack "released" Tim from paying for his part of the meal, or (b) Tim pays the restaurant, but Jack reimburses Tim because Jack agreed that Tim would "not incur any cost from the meal" as long as Tim drove and didn't eat all of the food. That Jack agreed to cover the cost of the meal, either by directly paying the restaurant or paying Tim back, is plain, even though the friends didn't use legal terms like "exculpation," "indemnification," or "hold harmless."

The court reads Paragraph 6 the same way. In exchange for TVA agreeing to let Jackson County build and operate its Park and Marina on TVA land, Jackson County agreed to (a) release its own claims against TVA if a third party or property is damaged because of TVA's concurrent negligence, or (b) reimburse TVA for any amount of liability that TVA paid an injured party or a decedent's estate to satisfy a judgment stemming from TVA's concurrent negligence. Just like Tim (the car driver) expects that Jack will cover the cost of their shared meal, TVA expects that Jackson County will cover TVA's portion of joint and several liability, either by direct payment or repayment, if TVA is less than 100% at fault. That's what "shall not incur any liability" for injury or death to a third party means. If Jackson County instead meant "shall not incur any liability *to Jackson County*," it could have said so.

42

—

This is the best, plainest reading of Paragraph 6. Below, the court explains why the parties' alternative readings have not persuaded the court to (a) change its mind about what Paragraph 6 says or (b) cite Paragraph 6 as a reason to dismiss any party's claims before liability has been proved and apportioned.

### 2. *TVA's Rule 12 Argument*

Before filing its indemnity claim, TVA asked the court to dismiss Plaintiffs' claims against TVA under Rule 12 because, in TVA's view, Paragraph 6's agreement that TVA "shall not incur any liability" for an injured person's damages meant that Plaintiffs could not sue them. The court disagreed. Using our restaurant analogy, TVA's argument was like saying that Jack and Tim's agreement that Tim would not pay for the meal precluded *the restaurant* from requiring Tim to pay for the food that he ate. But everyone would agree that the restaurant has the right to seek payment from anyone who orders and is served; it's up to Tim and Jack to decide who pays the bill. Likewise, our Plaintiffs were not parties to the 1963 Indenture between TVA and Jackson County, so they have the right to seek damages from any party who injured them. How those damages get paid is a question to decide only if Plaintiffs can first prove they are entitled to damages; it's not a question that entitled TVA to Rule 12 dismissal before liability is decided at trial. (*See* doc. 53, pp. 11-12).

### 3. *Jackson County's Rule 12 and 56 arguments*

The County has raised three text-based arguments across the Rule 12 motion this court previously denied (*see* doc. 224) and its present Rule 56 motion. While the court again declines to dismiss TVA's indemnity claim before deciding liability (if any) at trial, *see* Fed. R. Civ. P. 52(a)(3), the court explains why even though it does not agree that the County's readings of Paragraph 6 are the plainest readings, the County could still ultimately prevail if indemnity becomes an issue after trial.

43

A. *Exculpation-only*: As its primary argument in both its Rule 12 and Rule 56 motions, Jackson County argues that Paragraph 6 is just an exculpation clause (release of the County's claims); it does not also contain an indemnity agreement. Using our restaurant analogy, Jackson County's 'exculpation only' argument would mean that Jack only agreed not to ask Tim to pay for his half of the meal if Jack paid the bill, but Tim would have to pay for his half of the meal if the waiter brought Tim the bill instead. But just like our meal agreement envisions that Tim's meal is covered no matter who brings the bill, the court reads Paragraph 6 to contain both a release of TVA's liability to the County *and* an agreement to reimburse TVA if TVA is forced to pay an injured third party for the parties' joint negligence—meaning that the parties agreed that Jackson County would ultimately pay the bill regardless of which party an injured person sued, as long as TVA wasn't 100% at fault.

The court finds that its 'TVA never pays' reading is plainer than the County's 'exculpation only' reading for three reasons.

***First***, the County's reading violates the Surplusage Canon. Remember, Paragraph 6 uses the conjunctive "and" between the release clause and the clause agreeing that TVA cannot incur liability:

> 6. As part of the consideration for this indenture, Grantee [Jackson County] releases Grantor [TVA], its successors, assigns, agents, instrumentalities, and employees of and from, and agrees that they shall not incur, any liability for injury to or death to any person or persons or for any damage to or loss of property …

(Doc. 336-1, p. 9) (highlights added). To read "shall not incur any liability" to duplicate the earlier "release," rather than as a distinct provision with a distinct purpose, would cause the "shall not incur any liability" provision to "needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence," thus violating the surplusage canon. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 26, at 174 (2012). "Release" and "shall not

incur" have different meanings. Jackson County can only "release" something it possesses (for example, the County's claim(s) against TVA), while a promise that TVA "shall not incur" is a promise that TVA will not take on something that neither party possesses (for example, liability for a future injury to a third party).

***Second***, Paragraph 6 does not name the Grantee, Jackson County, as the object of the agreement that TVA "shall not incur liability." In fact, Paragraph 6 names no one as the object, naturally making the injured third party—*i.e.*, the party to whom TVA would be liable for injuring—the object: The Grantee "agrees that [TVA] shall not incur, any liability for injury to or death to any person or persons or for any damage to or loss of property . . . as a result of the exercise or enforcement of any of the other rights or interests reserved, excepted or otherwise retained under this indenture[.]" If the parties had intended that TVA would only avoid claims filed by Jackson County, rather than avoid liability from claims filed by injured third parties, then they would have instead written: The Grantee "agrees that [TVA] shall not incur, any liability <u>to Grantee</u> for injury to or death to any person or persons or for any damage to or loss of property[.]"

Jackson County helps make the point. In their Rule 56 briefing (*see* doc. 343, pp. 18-20), the County cites a slew of bankruptcy cases that use exculpation clauses, and it quotes this one to make the point:

> 12.5. Limitation of Liability of Exculpated Persons: The Exculpated persons shall not have or incur any liability <mark>to any Person served with a copy of this Plan or otherwise having notice regarding the filing of the Plan</mark>, including, without limitation, the Debtor, for any act taken or omission made in good faith in connection with or in any way related to, or arising our of, the Bankruptcy Case[.]

*Murphy v. Weathers*, No. 7:07-CV-00027-HL, 2008 WL 4426080, at *1–2 (M.D. Ga. Sept. 25, 2008) (highlight added). But this agreement makes the court's point, not the County's. In the highlighted clause, the Plan

expressly limits the liability waiver to persons who received a copy of the bankruptcy plan or had notice that it was filed. That makes sense; the creditors are giving up direct claims against the debtor because they are (a) part of the court process and (b) get something from the plan—*i.e.*, a confirmed schedule of distribution.

If Jackson County wanted the same exculpation agreement, limited to claims between the County and TVA, it should have similarly written:

> 6. As part of the consideration for this indenture, Grantee releases Grantor, its successors, assigns, agents, instrumentalities, and employees of and from liability, and agrees that they shall not incur, any liability to Grantee for injury to or death to any person or persons or for any damage to or loss of property …

Had the parties written and agreed to that clause, then the court would agree that its scope would be limited to the County denying its own right to file a claim against TVA for injuries to persons or property. But that's not what the parties agreed to. The parties agreed that TVA could not incur liability for property damage, injuries, and death to third parties who were not privy to the agreement. Because the parties lacked the ability to bar future injured parties from filing claims, someone is liable to pay them. And with the County agreeing that this someone "shall not" be TVA, the plain reading of Paragraph 6 is that the County took on the liability, unless TVA was solely at fault—which brings us to the third point.

**Third,** the court's reading gives teeth to the "sole negligence" carve out. Sole negligence is naturally distinguished from concurrent or shared negligence, concepts that arise when contracting parties might be joint and severally liable for a *third-party's* claim. Indeed, the enforceability of indemnity provisions that would cover the indemnitee's own negligence, sole or concurrent, was a common question in Alabama contracts when the parties signed the Indenture in 1963. *See, e.g., Batson-Cook Co. Industrial Steel Erectors*, 257 F.2d 410, 411 (5th Cir. 1958) (deciding

whether Alabama-based agreement "protects the indemnity against the consequence of its sole negligence"); *United States Fid. & Guar. Co. v. Mason v. Dulion Co.*, 145 So.2d 711, 717 (Ala. 1962) (deciding not to enforce indemnity clause because it did not "clearly indicate to us just what the parties did intend with respect to indemnity for a loss caused by the [indemnitee] contractor's negligence"). That the parties added the "sole negligence" exception to Paragraph 6 makes sense if you read the preceding clauses to govern who pays if the parties would otherwise be joint and severally liable to third parties for the damage they caused.

But the exception makes less sense, and has less to do, if Paragraph 6 is nothing more than Jackson County releasing its own claims against TVA. Alabama is a contributory negligence state, meaning that if Jackson County has any percentage of fault *vis-à-vis* TVA, then the County has no viable claim against TVA. As a result, the "sole negligence" carve out has little work to do. If the parties share fault for the County's injury, the County has no claim to release. And if only TVA is at fault for the County's injury, the carve out was unnecessary.

Because the "sole negligence" exception carries more weight when discussing indemnity for TVA's negligent acts that injure third parties than it does for the release of the County's claims against TVA, the court finds that the exception provides a third reason why the court's reading of Paragraph 6 is better than the County's 'exculpation only' reading.

2. *Sole Negligence – Nullity*: Jackson County also focuses on the "sole negligence" exception to make its second text-based argument. But the County reaches the opposite conclusion by misunderstanding joint and several liability and the definition of "sole negligence." The County starts by rightly noting that maritime law adheres to joint and several liability. (Doc. 343, p. 21). But it then argues:

> Under the principles of maritime law, therefore, Jackson County would already be liable for any share of fault allocated to it, and any attempt by TVA to enforce a claim for

47

> indemnity would be a claim for damages allocated to TVA in proportion to its degree of fault. Yet paragraph 6 of the Indenture specifically provides an exception for "personal injuries, property damage, or loss of life or property caused by the sole negligence of [TVA.]" Doc. 193, ⁋ 50 (emphasis added).   Thus, TVA's indemnity claim is tantamount to seeking indemnity for damages caused by TVA's "sole" negligence. Even if paragraph 6 were an indemnity clause, that very clause would bar TVA form seeking indemnity in the present action.

(*Id.*, pp. 21-22). Let's put that in simpler terms. Assume the court finds that the County's negligence was 50% at fault, TVA's negligence was 50% at fault, and a plaintiff suffered a $100 injury. The County assumes that both parties would pay the plaintiff $50 and argues that TVA would be precluded from asking the County to reimburse TVA's $50 payment because TVA's $50 liability stemmed from its "sole negligence" (*i.e.*, TVA was "solely" at fault for its 50% fault). So the court should dismiss TVA's indemnity claim before trial. This is wrong for two reasons.

First, the County misunderstands (or at least misrepresents) joint and several liability. If the hypothetical plaintiff proved a $100 injury, he would not ask the County for $50 and TVA for $50. The plaintiff could and likely would recover *all* $100 from TVA because TVA is jointly and severally liable. (The court assumes that's why Plaintiffs sued TVA, not Jackson County). TVA would then seek to recover all $100 from Jackson County because, in Paragraph 6, the County agreed that TVA would incur no liability for injuries to third parties. So the County's belief that, in Count III, TVA is merely asking for coverage for its own fault is misplaced.

Second, the County distorts the meaning of "sole negligence." If the combined negligence of two or more persons causes an injury, then the injury was not caused by "sole negligence." Putting that point into Paragraph 6's carve-out language, if the court finds that the County's negligence was a 50% cause of the plaintiff's injury, and TVA's negligence

was a 50% cause, then the court has necessarily found that the plaintiff's injury was not "caused by the sole negligence of the Grantor." That means TVA would not be asking the County to indemnify TVA for TVA's "sole negligence"; TVA would be seeking reimbursement for the parties' concurrent negligence.

Our restaurant analogy shows why this point should be obvious. Remember, Jack agreed that Tim would incur no cost of the meal unless Tim ate all of the food (*i.e.*, Tim was 'solely responsible' for the food's consumption). If the bill came, and Jack demanded that Tim pay for the cost of Tim's plate because Tim "ate all of the food on his plate," we should all agree that Jack would lose the argument—if not his friendship. But that's the County's argument: TVA is "solely" responsible for TVA's part of their joint responsibility. The court rejects it.

3. *Clear and unequivocal:* Jackson County's third argument is its best: Even if the court has the best reading of Paragraph 6, the court should still preclude TVA from seeking indemnity for the parties' joint liability because indemnity was not a "clear and unequivocal" part of the agreement as required by Alabama common law. (Doc. 204, pp. 18-25); *see also Nucor Steel Tuscaloosa, Inc., v. Zurich Am. Ins.*, 343 So. 3d 458, 469 (Ala. 2021) (explaining Alabama's common-law doctrine).

The County first made this argument in its Rule 12 briefing (doc. 204), and frankly, the court did not give it full consideration in its opinion denying the County's Rule 12 motion. The court instead focused on the County's primary argument: Paragraph 6 is a limited exculpation clause. (*See* doc. 224). But having now dealt with both sides' reading of the text in fuller detail in this order, the court would re-frame the County's secondary argument like this: Even if the court's reading of Paragraph 6 is the best, plainest reading of the text, can that reading be deemed "clear and unequivocal" as required by Alabama common law if the court relied on canons of construction to find implicit indemnification?

49

That's an open question, meaning this court hasn't decided it yet. It's clear that Alabama law does not require parties to use legal terms like "indemnify," "reimburse," or "hold harmless" when writing an indemnity agreement. *See id.* at 469 ("While particular language in the indemnity agreement is not required, the requisite intent of the parties must be clear."). But there must be some point where reading indemnity into a clause that does not contain the word "indemnity" or its variants goes too far. Is it the point where canons of construction get involved? Or perhaps it's when the court must infer the object of a release or indemnity provision because the parties failed to include the object.

The court needn't decide the breaking point here because indemnity may never be an issue. Perhaps Plaintiffs fail to prove causation. Perhaps Plaintiffs prove causation against Jackson County, but not against TVA. Until the court decides and apportions liability, indemnity is ripe for pleading (*see* doc. 224, p. 4) but not resolution. Plus, the court knows that, even if it ultimately decides that Paragraph 6 clearly and unequivocally contains an indemnity agreement, new questions about the enforceability and collectability of that agreement will arise. For example, does Alabama law allow Jackson County to enter into an indemnity agreement that puts taxpayers on the hook for another party's negligence? Does public policy forbid such an agreement? If not, does Alabama law place a cap on the amount of money that TVA can recover from a local government in a maritime case? There may be more, but the point is made: We are a long way from deciding how much money (if any) TVA can collect from Jackson County under Paragraph 6. So the court will put off those questions, including the question the County poses about 'clear and unequivocal' drafting, until they must be decided. That will allow the parties to fully brief and argue the issues, armed with the relevant facts and numbers.

—

To sum up, the court **DENIES** the County's motion for summary judgment on TVA Count III without stating its conclusion on the issue of 'clear and unequivocal' drafting. That issue can be re-raised, along with

50

any new arguments against the enforceability or collectability of indemnity under Paragraph 6, if the issue becomes ripe after the court enters judgment on liability.

## IV.    Scottsboro's Motion for Summary Judgment

Scottsboro also moves for summary judgment on TVA's third-party claims. Unlike TVA and Jackson County, Scottsboro didn't exercise control over the Park and Marina and had no role in the operation or maintenance of Dock B. Instead, Scottsboro, through its Fire Marshal, conducted visual inspections of the Park and Marina in the years leading up to the Dock B fire.

Scottsboro advances three arguments against Plaintiffs' negligence claims: (1) it owed no duty to Plaintiffs; (2) even if it did owe a duty, it did not breach that duty; (3) any breach committed did not proximately cause Plaintiffs' injuries. Scottsboro also contends that Plaintiffs' wantonness claim fails.

### A.    Negligence Claims

As explained, the Scottsboro Fire Marshal, Charles Bryant, visually inspected the Park and Marina, including Dock B, on at least two occasions; once in 2012 and again in 2016. The court says "at least" because Bryant admitted in his deposition there was a "good chance" his office inspected the Park and Marina yearly. (Doc. 323-1, p. 24). But Scottsboro lacks inspection records for any visits aside from the ones Bryant conducted in 2012 and 2016. (*See* docs. 323-44; 323-45). All agree, however, what Bryant was looking for during his inspections. Among other things, Bryant was (1) visibly ensuring there was a proper access point for fire response; (2) ensuring fire extinguishers were full and operational; (3) verifying extension cord quality; and (4) visibly inspecting breaker boxes to ensure they were not rusted, damaged, eroded, and that they were in good condition. (*See* doc. 323-1, p. 25-26).

Scottsboro contends that these voluntary inspections, no matter how frequent, did not create a duty of reasonable care to Plaintiffs. Both

Alabama and maritime law apply the Restatement (Second) of Torts § 324A to determine whether a party voluntarily undertakes a duty of reasonable care. *See Chandler v. Hosp. Auth. of Huntsville*, 548 So. 2d 1384, 1387 (Ala. 1989); *Miss Janel, Inc. v. Elevating Boats, Inc.*, 725 F. Supp. 1553, 1567 (S.D. Ala. 1989). That section provides:

> One who undertakes gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324(a). The court finds that § 324A's first two liability elements (*i.e.*, duty and breach) are satisfied.

While the parties dispute what triggered Scottsboro's inspections, no one disputes that Scottsboro voluntarily assumed a duty to reasonably inspect the Park and Marina, including Dock B. Given that Scottsboro would highlight any deficiencies or non-compliance issues found during these inspections, Scottsboro should have recognized its voluntary undertaking "as necessary for the protection" of Plaintiffs and other Park and Marina guests. Further, the scope of Scottsboro's inspections shows it might have breached its voluntary duty. As seen in the Fire Marshal inspection checklist, Bryant and his office would inspect, among other things, Dock B's electrical systems and breakers. (*See* doc. 323-1, pp. 138-39). If Bryant or someone else from Scottsboro inspected Dock B in the eight months between Barnes installing the labeled oversized breaker and

52

the Dock B fire, then Scottsboro would have noticed the lone 55-amp breaker in the breaker panel.[6] And while Bryant wasn't an electrician, his lack of expertise doesn't negate the fact that the oversized breaker was open and obvious, yet Scottsboro signed off on the condition of Dock B's breaker panels. Failing to identify the oversized breaker (a fire hazard) could breach Scottsboro's voluntary duty.

Even with Scottsboro's duty and breach established, § 324A liability can attach only if one of its "three alternative requirements" are met. *See Howell v. United States*, 932 F.2d 915, 918 (11th Cir. 1991). The court need not walk through each because, at this stage, it finds that Plaintiffs have shown enough facts to support alternative (c), reliance. Barnes made clear in his deposition that Jackson County took care to correct any deficiencies or issues uncovered by Scottsboro during the Fire Marshal's inspections. (*See* doc. 323-12, p. 79). Barnes also agreed that, as the Park and Marina manager, he relied on Scottsboro's inspections to determine whether Dock B's electrical system was safe. (*Id.* at p. 80). So a reasonable factfinder could infer that Jackson County's reliance on Scottsboro's inspections was the kind of reliance contemplated by alternative (c). *See Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1157 (11th Cir. 1993) (reversing summary judgment for a defendant insurer because the insured might "have more closely monitored" its operations and prevented plaintiff's injuries if not for the insurer's monitoring).

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable factfinder could find that Scottsboro undertook a voluntary duty under § 324A, Jackson County relied on that undertaking, and Scottsboro breached its voluntary duty. So the court **denies** Scottsboro's motion for summary judgment.

---

[6] Again, Bryant couldn't rule out conducting yearly inspections at the Park and Marina. (*See* doc. 323-1, p. 24). Instead, he said there was a "good chance" that Scottsboro inspected the Park and Marina every year. (*Id.*). Scottsboro's lack of records for inspections outside of 2012 and 2016 can't, standing alone, foreclose a genuine dispute of material fact when its Fire Marshal admits other inspections were likely conducted. Trial is needed to settle the fact issue.

### B.   Wantonness Claim

Next, Scottsboro contends that Plaintiffs' wantonness claim fails because (1) it's immune under Alabama state law and (2) the claim fails under general maritime law.

1. *State Law Immunity:* Scottsboro first contends that it's immune from Plaintiffs' wantonness claim under Ala. Code § 11-47-190. That section provides, in relevant part:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty …

The Alabama Supreme Court has interpreted § 11-47-190 to exclude liability for wanton misconduct by municipalities. *See Town of Loxley v. Coleman*, 720 So. 2d 907, 909 (Ala. 1998). So if Alabama law governed the negligence and wantonness standards here, Scottsboro would be right that it's immune from Plaintiffs' wantonness claim. But general maritime law controls the standard for Plaintiffs' wantonness claim, and it allows Plaintiffs to recover punitive damages in certain circumstances. *See In re Amtrak*, 121 F.3d at 1428; *Townsend*, 557 U.S. at 409. Applying § 11-47-190 would alter this standard by providing Scottsboro with state law immunity for a claim governed by federal maritime law. Under these circumstances, the immunity statute yields. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 210 (1996).

2. *General Maritime Law:* Like Jackson County, Scottsboro next contends that Plaintiffs' wantonness claims fail under general maritime law. The court will determine at trial whether Scottsboro's actions support a finding of wantonness or award of punitive damages.

———

To sum up, the court **denies** Scottsboro's motion for summary judgment in full. TVA's third-party claims for contribution and direct liability will proceed to trial.

## V.    SEPB's Motion for Summary Judgment

SEPB also moves for summary judgment against TVA's third-party claims against it. SEPB's only role in relation to the Park and Marina was to supply power to the Park and Marina under a 2016 Electric Service Agreement ("ESA") with Jackson County. TVA and Plaintiffs contend that, under the ESA, SEPB took responsibility for the Park and Marina's electric system down to, at least, the Dock B circuit breaker box with the oversized 55-amp breaker.

Aside from this contractual interpretation argument, Plaintiffs contend that SEPB contributed to the severity of the fire by placing a lock on Dock B's shore power disconnect before the fire. And TVA argues that summary judgment is precluded because SEPB failed to file an answer in response to TVA's Rule 14(c)(2) tender. The court walks through each argument in turn.

### A.    SEPB's Duty Under the Electric Service Agreement

SEPB contends that it owed the parties no duty beyond SEPB's obligations to provide power and maintain the electric system up to a certain point under the ESA. So the court starts with the ESA's plain language:

> WHEREAS SEPB currently provides electrical services to County Park located within the corporate city limits of the City of Scottsboro and the service currently terminates at the master electric meter just inside the County Park entrance from County Park Road; and
>
> WHEREAS [Jackson] County is currently responsible for

the primary and second electric service to all points of use within the County Park beyond the master meter; and

WHEREAS the parties hereto believe that it would [be] mutually beneficial to both parties for SEPB to own and maintain all primary and secondary electric service lines and components up to the ***point of delivery*** for each individual user within County Park.

NOW THEREFORE, based upon mutual consideration and conditions contained herein, being valuable consideration for each party to this agreement, the parties hereby agree as follows:

1. SEPB shall provide electrical services to the County at the Jackson County Park.

2. SEPB will erect and maintain or continue to maintain a "master electric meter" for all electricity delivered to County Park, with the exception of any building located in the County Park which is separately metered by SEPB.

3. The County has declared the entire electric plant including the electrical wires, transformers, utility poles, security lights and other equipment or electric devices to be surplus and does hereby convey the same to the SEPB in consideration for SEPB providing maintenance to the electric system within the County Park. All such electric plant is conveyed to SEPB "AS IS" with no warranty or guarantee of any kind, implied or otherwise. SEPB shall have the right to continue to use so much of the electric plant as it determines to be safe and usable but may remove or discard any such plant that it determines is not safe or usable for service within the County Park.

4. SEPB shall be responsible for the electric plant within the County Park from the point where such service enters

56

> the County Park, through the master meter, <mark>terminating at the point of delivery</mark> for each building, campsite, cabin, boat slip, or other individual point of delivery, generally being a meter or other cut off.

(Doc. 329-4, pp. 69-70) (highlight added). All parties agree that, under ¶ 4, SEPB's ownership and maintenance responsibilities for the Park and Marina's electric system end at the "point of delivery." As a result, SEPB may be held liable for Plaintiffs' fire causation claim only if the "point of delivery" is read to extend to the breaker box where Barnes allegedly installed the oversized breaker or some point beyond the breaker box and closer to (or on) the *Dixie Delight*.

The ESA does not define where the "point of delivery" is; it merely notes that the "point of delivery" relates to "each building, campsite, cabin, boat slip" and "generally [is] a meter or other cut off." (*Id.*). That's where the parties' interpretation and course of conduct comes in. Both SEPB and Jackson County have always treated the relevant "point of delivery" as the compression connectors near the weather heads at the top of the utility pole adjacent to Dock B. The parties have treated everything beyond that point—including the breaker box mounted on the utility pole, the lines running to Dock B, and the wiring, breakers, and outlets on Dock B—as owned and operated by Jackson County. SEPB and Jackson County representatives repeatedly confirmed their interpretation during discovery. For example, SEPB's corporate representative, Phillip Chaney, stated in his deposition that SEPB stops its ownership and operation "at the compression connectors at the top of the [utility] pole." (*See* doc. 329-4, p. 58). Likewise, when Barnes was asked whether SEPB "owns the electric system up to the individual boat slip[s]," he testified that "the only thing that [SEPB] was responsible for was the primary," which he defined as "the power pole right off Dock B." (Doc. 329-6, pp. 68-69). Barnes then stated that Jackson County "owned the shore power disconnect." (*Id.* at p. 69).

Despite not being parties to the ESA, TVA and Plaintiffs urge the court to ignore SEPB and Jackson County's interpretation and find the phrase "point of delivery" ambiguous enough to present a genuine issue of material fact. The court declines that invitation for two reasons. First, SEPB and Jackson County's interpretation and course of conduct is relevant for determining the meaning of their agreement. *See Noell v. Am. Design, Inc. Profit Sharing Plan*, 764 F.2d 827, 832 (11th Cir. 1985) (citing 4 S. Williston, W. Jaeger A Treatise on the Law of Contracts, § 623 at 789 (1961) ("An important aid in the interpretation of contracts is the practical construction placed on the agreement by the parties themselves."); *see also City of Montgomery v. Maull*, 344 So. 2d 492, 495 (Ala. 1977) ("If the language [of a contract] is ambiguous or uncertain in any respect, the surrounding circumstances, including the construction placed on the language by the parties are taken into consideration so as to carry out the intention of the parties.").

Second, TVA and Plaintiffs offer no record evidence to create a fact-based argument that the "point of delivery" is somewhere beyond the top of the utility pole.

To be sure, the ESA does not define the phrase "point of delivery," and reasonable minds can differ as to its meaning. But since the parties to the ESA agree that SEPB's obligations ended at the top of the utility pole, the court finds it best to follow Alabama and Circuit precedent and give the parties' construction of the contract the weight it deserves. As a result, SEPB had no duty with regards to the portion of the Dock B electric system where Barnes allegedly installed the oversized breaker.

### B.    Plaintiffs' "Locked" Shore Power Box Argument

Plaintiffs separately argue that, even if SEPB didn't owe a relevant duty under the ESA, it's still liable for negligence because it "locked the shore power breaker box preventing those at the scene of the fire from timely turning off the shore power which contributed to the severity of the fire." (Doc. 392, p. 21). SEPB argues that Plaintiffs' contentions are

unsupported by the record. The court agrees.

For starters, there is no evidence that SEPB installed a lock on the shore power breaker box before the fire. The closest thing Plaintiffs point to is an unconvincing exchange from Barnes' deposition:

> Q. Who has the lock on the share power disconnect?
>
> A. Scottsboro Electric.
>
> Q. Why?
>
> A. That's something you're going to have to ask them.
>
> Q. When did they put that lock on there?
>
> A. ***I guess*** when they built the dock.

(Doc. 329-6, p. 69) (emphasis added). As shown, Barnes didn't know when SEPB installed the lock; he merely guessed and told the questioner to ask SEPB. SEPB was asked, and Chaney testified that SEPB's electrical superintendent put the lock on the shore power box "after the fire" to ensure Dock B was not re-energized. (Doc. 329-4, p. 51). So the only evidence is that the lock was installed after the fire, meaning there is no genuine dispute for trial that could help Plaintiffs' theory.

Further, even if SEPB locked the shore power box before the fire, SEPN would still be entitled to summary judgment because there is no evidence that anyone tried to access the shore power box on the night of the fire. And if no one tried to access the locked shore power box to turn off the electricity, then the presence of the lock could not have proximately caused or worsened Plaintiffs' injuries. Either way, Plaintiffs' locked shore power box argument fails.

59

## C.    TVA's Rule 14(c)(2) Argument

In an effort to keep SEPB at the table, TVA argues that summary judgment is improper because, under Rule 14(c)(2), SEPB failed to respond to Plaintiffs' complaint directly and thus admitted the facts in Plaintiffs' complaint. Rule 14(c)(2) states:

> (2) *Defending Against a Demand for Judgment for the Plaintiff.*
>
> The third-party plaintiff may demand judgment in the plaintiff's favor against the third-party defendant. In that event, the third-party defendant must defend under Rule 12 against the plaintiff's claims as well as the third-party plaintiff's claim; and the action proceeds as if the plaintiff had sued both the third-party defendant and the third-party plaintiff.

As shown, Rule 14(c)(2) required SEPB to defend under Rule 12 against Plaintiff's claims as well as TVA's claims. SEPB never defended under Rule 12 against Plaintiffs' claims. Instead, it only answered TVA's claims, including its direct liability claim under Rules 9(h) and 14(c)(2). (*See* doc. 200, p. 4).

Even so, all Rule 14(c)(2) does is "permit[] courts to indulge in a legal fiction and proceed under the pretend assumption that the plaintiff had in fact sued the third-party defendant." *Best Indus. (Pvt), Ltd. v. Pegasus Mar., Inc.*, 2013 WL 2468030, at *1 n. 4 (S.D.N.Y. June 7, 2013). Recognizing this "legal fiction," the court will not enforce Rule 14(c)(2) to the point of technicality because SEPB has actively participated in this litigation for years and has moved for summary judgment on TVA's third-party claims. *See First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 298 (1968) (upholding grant of summary judgment to defendant who never answered complaint during more than six years of litigation); *see also Hise v. Philip Morris Inc.*, 208 F.3d 226 (Table), 2000 WL 192892, at *3 (10th Cir. 2000) ("We believe a summary judgment motion, seeking to

dispose of all the issues of a case, is an effort to otherwise defend, and as such, is sufficient to prevent default judgment.") (internal quotations omitted).

At bottom, this court must construe pleadings "so as to do justice." Fed. R. Civ. P. 8(e). Justice would not be served by finding that SEPB unknowingly admitted to the very claims it has spent years defending against; make SEPB attend trial; and, then grant SEPB judgment for the reasons already clear from the Rule 56 record.

———

For these reasons, the court **grants** SEPB's motion for summary judgment in full.[7]

## CONCLUSION

For the reasons above, the court:

- **DENIES** TVA's motion for summary judgment on Plaintiffs' claims (doc. 314);
- **DENIES WITHOUT PREJUDICE** TVA and Jackson County's motions to exclude Plaintiffs' expert Michael Pratt (docs. 316, 333);
- **DENIES WITHOUT PREJUDICE** TVA's motion to exclude Boris Datnow (doc. 318);
- **DENIES** Scottsboro's motion for summary judgment (doc. 320)
- **DENIES WITHOUT PREJUDICE** TVA and the third-party Defendants' motions to exclude Plaintiffs' expert John Frost (docs. 321, 325);
- **GRANTS** SEPB's motion for summary judgment (doc. 328);
- **DENIES** Jackson County's motion for summary judgment (docs. 330, 335); and
- **DENIES AS MOOT** TVA's motion to strike (doc. 377); and

---

[7] Because the court is granting SEPB's motion for summary judgment, the court will **DISMISS AS MOOT** SEPB's claim for contribution against Tim Parker. (*See* Doc. 240).

- **DENIES AS MOOT** Jackson County's motions for joinder (docs. 332, 403).

The court **DIRECTS** the Clerk of Court to remove SEPB as a Defendant.

The court will enter a separate order that carries out this ruling.

**DONE** and **ORDERED** on August 13, 2026.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE